816 So.2d 270 (2002)
James Joseph PINSONNEAULT, et al.
v.
MERCHANTS & FARMERS BANK & TRUST COMPANY, et al.
No. 2001-C-2217.
Supreme Court of Louisiana.
April 3, 2002.
*272 Andrew P. Texada, Mark D. Pearce, Russell L. Potter, Stafford, Steward & Potter, Alexandria; Lloyd J. Lunceford, Baton Rouge, William S. McKenzie, Counsel for Applicant.
John K. Anderson, Leesville, Christopher L. Whittington, Counsel for Respondent.
Kimberly Atkins (pro se), Christian Boyd (pro se), Lawson Strickland (pro se).
David J. Boneno, Metaire, Counsel for Louisiana Bankers Assn. (Amicus Curiae).
David S. Bland, New Orleans, John A. Cangelosi, Baton Rouge, Timothy S. Madden, New Orleans, Counsel for Debra A. *273 Deroche and Norman J. Deroche, Jr. (Amicus Curiae).
Paul H. Due, Baton Rouge, Counsel for Louisiana Trial Lawyers Assn. (Amicus Curiae).
WEIMER, Justice.
In the early morning hours of November 3, 1992, twenty-three year old Jesse Pinsonneault was tragically and senselessly shot and fatally wounded while attempting to deposit his employer's daily receipts into the night deposit box of Merchants & Farmers Bank & Trust Company ("Merchants Bank") in Leesville, Louisiana. His parents, James and Debra Mae Pinsonneault, instituted this wrongful death and survival action against Merchants Bank, alleging that the bank failed to provide adequate security for the after-hours patrons of its night depository. Following a bench trial, the trial court determined that although the bank owed a duty to Jesse Pinsonneault, it did not breach that duty. The Pinsonneaults appealed. Concluding that the trial court was manifestly erroneous in determining that there had been no breach of the duty to provide adequate security, the Court of Appeal reversed. See Pinsonneault v. Merchants & Farmers Bank & Trust Company, 99-12 (La. App. 3 Cir. 7/21/99), 738 So.2d 172. Merchants Bank applied to this Court for writ of certiorari. Because the Court of Appeal's ruling pre-dated our decision in Posecai v. Wal-Mart Stores, Inc., 99-1222 (La.11/30/99), 752 So.2d 762, we granted the bank's writ application and remanded this case to the Court of Appeal for consideration in light of Posecai. See Pinsonneault v. Merchants & Farmers Bank & Trust Company, 99-2681 (La.2/4/2000), 753 So.2d 842. On remand, the Court of Appeal affirmed its previous decision assessing the Bank with liability for Jesse's death. See Pinsonneault v. Merchants & Farmers Bank & Trust Company, 99.0012 (La.App. 3 Cir. 6/27/01), 789 So.2d 762. We granted this writ of certiorari to determine whether the Court of Appeal erred in overturning the trial court's determination that Merchants Bank did not breach its duty to provide adequate security. After a thorough review of the record, we conclude that the Court of Appeal failed to properly apply the manifest error standard of review, and thus erred in reversing the trial court's verdict in favor of Merchants Bank. Accordingly, we reverse the Court of Appeal's decision and remand.

FACTS AND PROCEDURAL HISTORY
At approximately 1:30 a.m. on November 3, 1992, Jesse Pinsonneault, the twenty-three year old assistant manager of Sambino's Pizza, left work and drove to a nearby branch of Merchants Bank in order to deposit the evening's receipts and operating cash into the bank's night deposit box. The bank is located on Entrance Road, which leads to Fort Polk in Leesville, Louisiana. It is approximately 300 feet from Sambino's Pizza.
Two Vernon Parish Jail trustees, Lawson Strickland and Christian Boyd, had escaped from jail on October 28, 1992, and had been at large for five days. According to Boyd, who testified at trial via deposition[1], the two escapees were in need of money and had planned the robbery the previous evening, having hidden out in the area behind the bank for hours and watched the night deposit for potential *274 victims. Jesse's deposit was the only transaction they had observed that previous evening. Boyd testified that he and Strickland chose this particular bank for its location and the cover it afforded. They planned to escape through the woods behind the bank, which was within walking distance of the trailer in which they had been staying.
The night of the robbery, Strickland and Boyd hid atop a hill behind a McDonald's Restaurant adjacent to the bank and watched for Jesse to approach. When Jesse emerged from Sambino's, Strickland ran down the hill and secured a hiding place behind the bank, a full service branch which included an ATM, a drive-up window and a night deposit box located on the McDonald's side of the bank under a canopy that extends over the drive thru lanes. As Jesse exited his car and walked up to the night deposit box, Strickland confronted him, brandishing a gun and demanding the deposit money. In the ensuing struggle over the $64.06 in cash in the night deposit bag, Strickland shot Jesse in the area of the clavicle. He died at an Alexandria hospital nine hours later.
Jesse's parents filed a wrongful death and survival action against Merchants Bank and its insurer, Aetna Casualty & Surety Company (the "Merchants Bank defendants"), alleging that the bank failed to provide adequate security to customers using the night depository. The Vernon Parish Sheriff was also named a defendant for allowing Boyd and Strickland to escape. Jesse's mother asserted a claim pursuant to LSA C.C. art. 2315.6 for the severe emotional distress she suffered upon arriving at the scene immediately after the shooting. Tragically, Mrs. Pinsonneault died of cancer prior to trial. Jesse's twin brother, Orin David Pinsonneault, became succession representative and was substituted as the proper party plaintiff to assert Mrs. Pinsonneault's claims.
The Merchants Bank defendants filed a third-party demand against Strickland, Boyd, and Kim Atkins, a minor at the time of the shooting, who provided transportation to Strickland and Boyd and who gave them the gun used in the shooting. Both the Pinsonneault family and Merchants Bank requested trial by jury, but the trial court subsequently granted a motion by Merchants Bank to strike the jury. The Vernon Parish Sheriff settled with the Pinsonneaults prior to trial.
The case was tried to the trial court over a period of five days, at the conclusion of which time the matter was taken under advisement. On October 26, 1998, the trial court issued judgment in favor of the Merchants Bank defendants, dismissing the claims of the Pinsonneault family with prejudice. In written reasons dated October 14, 1998, the trial court explained that while the bank owed a duty to provide its customers with a reasonably safe place to conduct normal banking business, its actions prior to November 3, 1992, were adequate and reasonable and it did not breach the duty owed.
The Pinsonneault family appealed and the Merchants Bank defendants answered that appeal. Determining that the trial court was manifestly erroneous in concluding that Merchants Bank did not breach its duty to provide those safety features reasonably needed to protect from attack those patrons who are invited to bring money to its night depository, the Court of Appeal reversed. In so doing, the Court of Appeal repudiated the trial court's determination that the assault on Jesse Pinsonneault was not reasonably foreseeable. Because it determined that an armed robbery at the night deposit was foreseeable, the Court of Appeal held that the likelihood that the bank's failure *275 to provide security would lead to the shooting death of a night deposit patron far outweighed the cost of installing surveillance cameras and taking other precautionary measures. Additionally, the Court of Appeal found that Merchants Bank assumed a duty to protect the public when it adopted its own security plan, and that it acted unreasonably in its implementation of that plan. The Court assessed damages. It awarded $350,000 to each of Jesse's parents for his wrongful death, $100,000 to Jesse's mother for her bystander claim, $400,000 for Jesse's survival claim, and special damages in the stipulated sum of $36,890.87, for a total damage award of $1,236,890.87. The Court found that because Boyd and Strickland were no longer "in the process of their escape" at the time of their attack on Jesse Pinsonneault, the Vernon Parish Sheriff was not liable. Concluding that it was mandated by LSA-C.C. art. 2323(A) to quantify the fault of all persons implicated in this tragic incident, including the intentional tortfeasors, the Court of Appeal allocated forty percent of the fault for Jesse's injury to Merchants Bank and sixty percent to the three intentional tort-feasors, Strickland, Boyd and Atkins, in the proportion of twenty-five each to Strickland and Boyd and ten percent to Atkins.[2] However, the Court of Appeal found that while it was required by the 1996 amendments to LSA-C.C. art. 2323 to quantify the fault of all persons contributing to the plaintiffs' injury, it was not required to use that quantification to reduce the plaintiffs' recovery. Relying on this Court's decision in Veazey v. Elmwood Plantation Associates, Ltd., 93-2818 (La.11/30/94), 650 So.2d 712, the Court of Appeal declined to reduce Merchant Bank's liability for damages by the percentage of fault attributable to the intentional tortfeasors. Accordingly, it cast the Merchants Bank defendants for one hundred percent of the Pinsonneaults' damages.
Subsequent to the date the Court of Appeal rendered its decision in this case, we handed down our decision in Posecai v. Wal-Mart Stores, Inc., supra, adopting a balancing test for determining when business owners owe a duty to provide security for their patrons. Upon application of the Merchants Bank defendants, we granted certiorari and remanded this case to the Court of Appeal for consideration in light of Posecai. On remand, the Court of Appeal re-examined the duty issue. It determined that under the facts and circumstances of this case, Merchants Bank owed a duty to protect Jesse Pinsonneault from the criminal acts of his assailants and affirmed its previous decision assessing Merchants Bank with liability for Jesse's death. Pinsonneault, 99-0012 (La.App. 3 Cir. 6/27/01), 789 So.2d 762. We granted certiorari to review the correctness of that decision. Pinsonneault, 01-2217 (La.11/21/01), 801 So.2d 1080.[3]

LAW
Louisiana courts have adopted a duty-risk analysis in determining whether to impose liability under La. Civ.Code art. 2315. In order for liability to attach under a duty-risk analysis, a plaintiff must prove *276 five separate elements: (1) the defendant had a duty to conform his or her conduct to a specific standard of care (the duty element); (2) the defendant failed to conform his or her conduct to the appropriate standard of care (the breach of duty element); (3) the defendant's substandard conduct was a cause-in-fact of the plaintiffs injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiffs injuries (the scope of protection element); and (5) actual damages (the damage element). See Roberts v. Benoit, 605 So.2d 1032 (La. 1991), on rehearing, 605 So.2d at 1050, 1051 (La.1991); Fowler v. Roberts, 556 So.2d 1, 4 (La.1989), on rehearing, 556 So.2d at 13 (La.1989); see also Mundy v. Dept. of Health and Human Resources, 620 So.2d 811 (La.1993); Thomas C. Galligan, Jr., A Primer on the Patterns of Negligence, 53 La.L.Rev. 1509, 1510 (1993). See also Perkins v. Entergy Corporation, 98-2081, 98-2082, 98-2083, p. 21 (La.App. 1 Cir. 12/28/99), 756 So.2d 388, 403, aff'd, XXXX-XXXX, XXXX-XXXX, XXXX-XXXX, p. 7 (La.3/23/01), 782 So.2d 606, 611.

DISCUSSION
The threshold question in any duty-risk analysis is whether the defendant owed a duty to the plaintiff. Posecai, 99-1222 at 4, 752 So.2d at 766; Meany v. Meany, 94-0251, p. 6 (La.7/5/94), 639 So.2d 229, 233. Whether a duty is owed is a question of law. Peterson v. Gibraltar Savings & Loan, 98-1601, 98-1609, p. 7 (La.5/18/99), 733 So.2d 1198, 1204; Faucheaux v. Terrebonne Consolidated Government., 615 So.2d 289, 292 (La.1993).
In Posecai, we held that while business owners generally have no duty to protect others from the criminal acts of third persons, "they do have a duty to implement reasonable measures to protect their patrons from criminal acts when those acts are foreseeable." Posecai, 99-1222 at 5, 752 So.2d at 766. Determining when a crime is foreseeable is a critical inquiry in the duty equation. Id. This inquiry is answered employing a balancing test. As we explained in Posecai:
The foreseeability of the crime risk on the defendant's property and the gravity of the risk determine the existence and the extent of the defendant's duty. The greater the foreseeability and gravity of the harm, the greater the duty of care that will be imposed on the business. A very high degree of foreseeability is required to give rise to a duty to post security guards, but a lower degree of foreseeability may support a duty to implement lesser security measures such as using surveillance cameras, installing improved lighting or fencing, or trimming shrubbery. The plaintiff has the burden of establishing the duty the defendant owed under the circumstances.
The foreseeability and gravity of the harm are to be determined by the facts and circumstances of the case. The most important factor to be considered is the existence, frequency and similarity of prior incidents of crime on the premises, but the location, nature and condition of the property should also be taken into account. It is highly unlikely that a crime risk will be sufficiently foreseeable for the imposition of a duty to provide security guards if there have not been previous instances of crime on the business' premises.
Posecai, 99-1222 at 8-9, 752 So.2d at 768.
In the instant case, there had been two armed robberies of this particular branch of Merchants Bank in the fourteen year period prior to the attack on Jesse. The first occurred in 1984, during regular banking hours, when robbers absconded with cash from the bank. No customers *277 were robbed. The perpetrators escaped using a helicopter they landed on the bank's front lawn. The second robbery took place in 1989. Again, this was a daytime robbery, during regular operating hours. No patrons were robbed. In this incident, the lone perpetrator escaped to the woods behind the bank through the northeast corner of the bank's property.
With the exception of these two daytime offenses against the bank, there had been no other incidents. There had never been an attack on a customer, either during the day or at night. In fact, there had never been an attack on a customer using the night depository at any bank in the history of Vernon Parish. Moreover, while evidence indicated this particular branch of Merchants Bank was located in the second highest crime district in Vernon Parish, these statistics were misleading. The "district" covered a broad geographical area. The crime statistics that were furnished reflected not just crimes reported, but all incidents in which calls for assistance were made, including calls for emergency assistance or escorts. Moreover, the statistics reflected a steady decrease in the number of reported incidents dating from 1991. In 1991, for example, there were six armed robberies in the entire district, but only two such robberies in 1992; and, there were no calls of homicides or attempted homicides in the district in either year. The areas within the district reflecting the highest crime rate-the Sandy Hill area and the Billy Goat Hill areawere a mile and a half to two miles away from the bank. In the area within a half mile radius of the bank, the crime statistics were among the lowest in the district, with nonviolent, economic crimes such as shoplifting and writing bad checks accounting for the majority of the offenses.
A careful consideration of the previous incidents of criminal offenses on the bank property thus reveals that there was never a crime perpetrated on the bank's customers similar to the assault on Jesse. In fact, there were no crimes against any bank patrons prior to the random, unprovoked attack on Jesse. That the risk to patrons of the bank's night depository was low is evidenced by the nationwide statistics on crime at night deposits. As plaintiffs' own expert acknowledged, there had been only 90 night deposit crimes reported nationwide in 1989. By 1992, that number had increased only slightly to 112. Crime statistics complied by the FBI evidence that night deposit crime represented a very small percentage of bank crimes nationwide. In Vernon Parish, before the attack on Jesse Pinsonneault, it was nonexistent.
Given these facts, it appears that night deposit customers at Merchants Bank faced a very low crime risk. Therefore, we concur with the trial court and find that Merchants Bank, like the business owner in Posecai, did not possess the requisite foreseeability for the imposition of a duty to employ heightened security measures for the protection of patrons of its night depository.
This finding does not end our inquiry with respect to the bank's duty, however. As we cautioned in Posecai, while the existence, frequency, and similarity of prior incidents of crime on the premises is an important consideration in the duty determination, other factors, such as the location, nature, and condition of the property should also be taken into account. Posecai in no way implies, nor should it be interpreted to imply, that a business' duty to protect customers from the criminal attacks of third persons does not arise until a customer is actually assaulted on the premises. To the contrary, Posecai recognizes, and we reiterate, that while businesses are generally not responsible for *278 the crime that haunts our communities, "business owners are in the best position to appreciate the crime risks that are posed on their premises and to take reasonable precautions to counteract those risks." Posecai, 99-1222 at 8, 752 So.2d at 768.
In this case, both lower courts determined that the bank, while not owing a heightened duty of protection such as would require the hiring of security guards, did recognize that certain security precautions on its premises were warranted. The facts disclose that in April 1992, pursuant to FDIC regulations, the Bank adopted a written security plan, the goal of which it defined as follows:
The purpose of bank security is to produce and initiate a positive program of action designed to maximize security for bank employees, the public, and bank assets against crime and other hazards and to comply with the provisions of the Federal Deposit Insurance Corporation Regulations as detailed in subpart A section 326.0 through 326.4. [Emphasis added.]
The plan requires, among other things, an annual survey of each banking location which is to include "a review of the crime statistics in the vicinity of the banking facility and the physical characteristics of the banking facility and the surrounding neighborhood." Additionally, the plan requires that in this survey, consideration be given "to law enforcement locations and reaction times, perceived threats to employees and customers, the amount of funds exposed to loss, and other security procedures utilized by the bank." While the bulk of the security measures outlined in the plan are directed at protecting the physical assets of the bank, the foregoing provisions clearly envision the recognition of a duty by Merchants Bank to implement reasonable security measures for the protection of its customers. Therefore, we agree with the lower courts and find that Merchants Bank, through its own security manual, recognized a duty to provide a reasonably safe place for its patrons to conduct normal banking business. In fact, not only did the bank recognize a duty to its patrons through the adoption of a written security plan, it took affirmative steps in furtherance of that plan, providing lighting at its night time depository, erecting fencing along vulnerable perimeters, and setting up a schedule for the installation of modern surveillance cameras at each of its branches.
Thus, we have no difficulty determining the defendant bank had a duty to implement reasonable security measures.[4] Whether a defendant has breached a duty is a question of fact. Peterson, 98-1601, 98-1609 at 7, 733 So.2d at 1204.
Factual determinations of the trier of fact may not be reversed absent manifest error or unless they are clearly wrong. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). In order to reverse a trial court's determination of fact, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the factfinder is clearly wrong or manifestly erroneous. Stobart v. State, *279 Department of Transportation and Development, 617 So.2d 880, 882 (La.1993). The appellate court must be cautious not to reweigh the evidence or to substitute its own factual findings just because it would have decided the case differently. Ambrose v. New Orleans Police Department Ambulance Service, 93-3099,93-3110, 93-3112, p. 8 (La.7/5/94), 639 So.2d 216, 221.
[T]he reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts.
Canter v. Koehring Company, 283 So.2d 716, 724 (La.1973). Thus, where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Stobart, 617 So.2d at 883.
In the present case, we conclude, after review of the record, that the trial court was presented with two permissible views concerning whether Merchants Bank took adequate precautions to guard against the risk of criminal assault on customers of its night deposit. The trial court's finding that the actions of the bank prior to November 3, 1992, were adequate and reasonable and not a breach of its duty to provide security is not manifestly erroneous. On review, the Court of Appeal simply substituted what it believed to constitute reasonable security measures for the finding of the trial court as to the reasonableness of the bank's precautions at the Entrance Road branch. While there is certainly room for debate in every case as to what security measures are reasonable, the determination is essentially a factual one, requiring a careful balancing of factors that is best conducted at the trial court level, where the gravity of harm and costs of remediation can be analyzed and weighed. It is not the role of the appellate court to second guess the trier of fact's determination in this regard, but to review that determination for clear error.
In this case, the Court of Appeal found that Merchants Bank was negligent because it (1) did not install video cameras at the night deposit, (2) did not trim its shrubbery, (3) did not extend its fence to completely enclose the property on three sides, and (4) did not improve its lighting. This conclusion was based largely on the testimony of plaintiffs' expert witness, Dr. Norman Bottom, a professional security consultant and certified crime prevention practitioner. Dr. Bottom opined that adequate night deposit security required adherence to three "L's"lighting, landscaping, and location. It was Dr. Bottom's opinion that the bank's actions with regard to each of these security measures fell below the acceptable standard of care.
For example, Dr. Bottom opined that while the level of light in the immediate area of the night deposit box was more than adequate, "bright" even, the light in the back parking lot and the driving area on the side of the bank near the night depository fell below the minimum standards of the Illuminating Engineering Society for the visual detection of hazards and created a trap for unwary night deposit customers. A review of the record reveals conflicting evidence in this regard.
Larry Smith, the Chief Investigator for the Vernon Parish Sheriffs Office, who *280 was called out to the scene that night testified that the rear parking lot of the bank had sufficient light to enable him to see his watch, read his notepad and take notes. Sidney Williams, the deputy who patrolled the bank, driving up the driveway and around the back 8 to 10 times a night, testified that although the lighting in the back of the bank was not as bright as it was under the drive-thru canopy, a person standing in the back would be visible. Donald Baker, a friend of Jesse's who ran from Sambino's to offer assistance the moment he heard Jesse's cries for help, testified that although dimmer than the light under the drive-thru canopy, the light in the back parking lot was sufficient to see someone in the area. In fact, Regina Cravens, a fellow Sambino's employee who was present that evening and who testified at Strickland's criminal trial, acknowledged that she could see Strickland as he fled, discern what he was wearing and tell that he had something silver on his hip.
Dr. Francis Schreiber, the expert in ATM and night deposit security called to testify for the defense, explained that the purpose of lighting for ATM's and night depositories is to ensure a customer's ability to perceive people in and around the area of the ATM or night depository who might pose a potential threat. According to Dr. Schreiber, the lighting standards set by the Society of Illuminating Engineers are principally directed to the visual detection of hazards on the ground and are therefore of limited relevance to the issue of whether the light in the back parking lot was adequate to illuminate Strickland's presence. Dr. Schreiber testified that he conducted his own visual inspection and concluded that the lighting at the bank on November 3, 1992 was adequate. According to Dr. Schreiber, from the hill behind McDonald's, some 240 feet away, one could see human forms near the night deposit. From a radius of fifty feet, the standard distance employed by then current legislation setting lighting standards at night deposits and ATM's, the lighting was sufficient to detect a potential assailant.
The trial court found that the area around the night deposit box was "very well lighted" (even co-defendant Boyd agreed that this was the case) and that the rear of the bank was lighted "so that it was possible to see someone." Given the foregoing testimony, we cannot say that the trial court's determination as to the adequacy of the bank's lighting was an unreasonable one.
The same analysis holds true with respect to the shrubbery located along the back wall of the bank. Christian Boyd testified that on the night of the robbery, he and Strickland waited atop the hill behind the McDonald's for Sambino's to close. When they observed Jesse leave the pizza shop, Strickland ran down the hill and hid behind the shrubbery along the back wall of the bank, which, according to Boyd, was 3 to 4 feet tall. Dr. Bottom, plaintiffs' expert, testified that bushes and shrubs in the vicinity of a night deposit box should be no more than two feet high and spaced so as to prevent someone hiding behind them. However, he also acknowledged that even if the shrubbery had been removed entirely, there were other areas on the premises where Strickland could have concealed himself.
At any rate, the evidence as to the actual height of the shrubbery was conflicting. Boyd, who never got closer than 60 yards to the back of the bank, estimated that the shrubs were 3½ to 4 feet tall. Deputy Sidney Williams characterized them as "waist high." Detective Larry Smith, the investigating officer, testified that the shrubs were "knee high." Detective Smith also noted that while it was "possible" for someone to hide behind the shrubs, he *281 made a careful inspection of the area that evening and did not find anything to indicate that anyone had, in fact, been behind those shrubs. There were no footprints between the shrubs and the back wall of the bank and no broken branches or other signs of disturbance. Ronald Steed, the Chairman of the Board, President and CEO of Merchants Bank, testified that he examined the shrubs following the assault on Jesse and did not believe that anyone could hide behind them. Dr. Schreiber testified that although he probably would have preferred for the shrubbery to have been lower, if the bushes had been the height that Det. Smith recollected, he would not have looked at them twice. Their contribution to this incident, he opined, was marginal.
Given the conflicting testimony as to the role the shrubbery along the back wall of the bank played in this attack, we cannot say that it was unreasonable for the trial court to find that the height of the shrubbery did not contribute to this incident. There was a reasonable factual basis for finding that the shrubs were not too high and that the bank did not breach its duty to take adequate precautions to trim the bushes along its back wall.
In its opinion, the Court of Appeal also faults Merchants Bank for failing to extend its fence along the property line adjacent to the McDonald's Restaurant. According to the Court, a fence along the McDonald's boundary would have prevented easy escape and served as a deterrent to criminal activity. The testimony adduced at trial reveals that the existing fence, an eight foot tall hurricane fence with barbed wire along its top, was erected following the 1989 daytime robbery of the bank. In that robbery, the perpetrator had escaped into the woods at the northeast corner of the property. The bank erected a fence along its north and east property lines in order to block that avenue of escape. It did not extend the fence along its boundary with McDonald's for several reasons: esthetic considerations as well as practical ones. Customers of both the bank and McDonald's regularly traversed the area to either dine or obtain money from the ATM machine. Dr. Schreiber testified that the installation of fencing around a bank was not a common practice in 1992, and that in this instance, extending the fence would not have served as a deterrent because an existing right of way across the front of the property prevented the extension of the fence all the way forward and, thus, would not have made Strickland's escape significantly more difficult. The configuration of the fence along wooded sides of the property actually forced traffic towards the more visible, commercial side of the property. Given this testimony, it was not unreasonable for the trial court to conclude that the bank's failure to extend its fence did not constitute a breach of its duty to provide adequate security for patrons of its night depository.
Finally, the Court of Appeal finds fault with Merchants Bank for its failure to install surveillance cameras at its night depository at the Entrance Road branch where Jesse was attacked. The testimony reveals that in September of 1992, a robbery occurred at the North City Branch of Merchants Bank. That particular branch, unlike the Entrance Road branch, did not have continuous video surveillance cameras inside the bank. The North City branch had only still cameras that had to be activated by pushing a button. On the date of the North City robbery, the teller, fearing for her safety, was not able to activate the still camera. Following this incident, the bank made a decision to update the security cameras at all its locations. The plan called for upgrading the equipment at all *282 of the branches, starting with the branch with the most antiquated equipment. The process of installing video cameras, both inside and outside the branches, at the night deposit boxes and ATM's, had already begun at the time Jesse was attacked, but a camera had not yet been installed at the night deposit box at the Entrance Road branch because that branch, being a newer facility, had more modern video equipment in its interior.
The trial court found that the efforts of the bank to upgrade its surveillance cameras were reasonable. This conclusion was supported by testimony establishing that very few banks in Louisiana had surveillance cameras for their night deposit boxes in 1992. Moreover, and most significantly, ample record testimony supports the conclusion that surveillance cameras have very little deterrent effect on violent crime. Ronald Steed, the President and CEO of Merchants Bank, testified that the primary purpose for installing cameras at night deposits was to deter customer fraud: claims by depositors that they had made a deposit that had not been recorded by the bank. Defense expert, Dr. Schreiber, explained that the deterrent effect of surveillance cameras on armed robberies is actually very small. Out of 9,512 reported bank robberies in 1992, there were security cameras in place in 9,124 of them. Christian Boyd initially testified that the presence of security cameras would have made a difference in his decision to rob Jesse Pinsonneault. However, elsewhere in his testimony he contradicted himself when he acknowledged that he did not bother to check the boxes located in the drive-thru to see if cameras were present, and that he "didn't really care" if cameras were present. Obviously, the trial court's determination that the lack of a surveillance camera in the night depository area of the Entrance Road branch did not constitute a breach of the bank's duty to patrons such as Jesse was reasonable.
After reviewing the record in its entirety, the trial court's determination that the Bank did not breach its duty to plaintiff was reasonable. The trial judge was presented with two permissible views of whether or not the Bank's security plan was reasonable. Apparently, the court was not persuaded that the lighting, landscaping or lack of security cameras and fencing was the cause of the attack on Jesse, or that the attack was foreseeable such that the bank was obligated to engage in additional security measures.
In sum, no one suggested security guards were necessary for the bank to fulfill its security obligation.[5] In finding a breach of duty, the court of appeal focused on the alleged security deficiencies at the Bank as consisting of a lack of lighting and security cameras, inadequate fencing and excessive shrub height.
However, there is a reasonable factual basis for determining the lighting was adequate. There is a reasonable factual basis for determining the lack of security cameras was not a deterrent. The height of the shrubs was disputed as was the role of the shrubs in this incident. Fencing existed and the need for additional fencing and the deterrent effect of additional fencing was disputed. Given the absolute absence of this type of crime in Vernon Parish and the absence of significant crime in the area near the bank, there is no basis for determining an attack at the night deposit was sufficiently foreseeable such that the bank was obligated to upgrade security. Lighting *283 was adequate and fencing was in place. In our application of the Posecai balancing test, we find the decision of the trial court was reasonable in its determination the Bank did not breach its duty regarding security.
The court of appeal misapplied the manifest error standard of review by reweighing the evidence and substituting its judgment for that of the trial court. Therefore, we hold that the Court of Appeal erred in reversing the trial court's verdict and rendering judgment in favor of the Pinsonneaults.
Because we find that there was no breach of duty, it is unnecessary to address causation, damages, and the apportionment of fault.

CONCLUSION
We find that the Court of Appeal erred in ignoring the manifest error standard of review and substituting its own conclusions for those of the trial court. Therefore, we reverse the Court of Appeal's judgment in favor of plaintiffs.
REVERSED.
JOHNSON, J, dissents and assigns reasons.
JOHNSON, J., dissents and assigns reasons.
I would affirm the decision of the court of appeal, assessing the bank with liability for the death of plaintiffs decedent, Jesse Pinsonneault. I agree with the court of appeal that, in accordance with Louisiana's duty-risk analysis and this Court's decision in Posecai v. Wal-Mart, 99-1222 (La.11/30/99), 752 So.2d 762, the bank had foreseeability of harm to its patrons sufficient to impose a duty to add adequate security measures. The bank's failure to provide such measures constitutes a breach of this duty.
In Posecai, we concluded that the extent of a defendant's duty is determined by the foreseeability and gravity of the risk. We stated that the most important factor to be considered is the existence, frequency and similarity of prior incidents of crime on the premises. The majority in the instant case, while acknowledging two prior armed robberies of this particular bank branch, found that these crimes were not similar to the assault on Mr. Pinsonneault. The majority further chose to discredit the evidence indicating that this particular bank branch was located in the second highest crime district in Vernon Parish and concluded that the bank did not possess the requisite foreseeability for the imposition of a duty to employ heightened security measures for the protection of patrons of its night depository. I respectfully disagree.
The court of appeal correctly found that although the prior crimes lacked similarity to the instant assault, they were nevertheless "predatory offenses which convey a risk of harm to both employees and customers of the bank." Pinsonneault, 789 So.2d at 764, 765. In addition, the record reveals that the bank had been informed of the hazards posed by the nature of its business through a banking newsletter, the Advisor, which repeatedly reported night deposit crimes and advised of the need to formulate security procedures and to install protective security measures.
We also found in Posecai that the location, nature, and condition of the property should also be taken into account when determining foreseeability. In addition to risks inherent in the banking business, the record reveals several unsafe conditions at this bank in the case before us which support the court of appeal's finding of foreseeability. These conditions include: the lack of an enclosing fence around the bank's perimeter, which facilitated an easy *284 escape for criminals; the thick hedge-like shrubbery measuring approximately 3½-4 feet tall, which provided an easy hiding place for criminals; the poor lighting positioned away from the night depository, also accommodating a criminal's ability to hide, and the lack of surveillance cameras, which serve as a deterrent from criminal activity.
The record supports the court of appeal's conclusion that the bank "possessed the requisite foreseeability to impose a duty to implement, at the very least, security measures such as installation of improved lighting and functional surveillance cameras, installing fencing which would have enclosed the entire property and shield the property from the adjacent wooded area, and trimming and maintaining the shrubbery at a level which would not facilitate hiding." Pinsonneault, 789 at 766.
NOTES
[1] Boyd testified from the Avoyelles Correctional Center where he was incarcerated after pleading guilty to armed robbery and manslaughter in connection with the assault on Jesse Pinsonneault. Strickland, who was convicted of first degree murder and sentenced to death, refused to testify.
[2] Thus, the Court of Appeal found the fault of the bank more substantial than that of Strickland, the armed robber who intentionally fired the fatal shot.
[3] Before discussing the merits of this case, we note that plaintiffs filed a Motion to Strike a portion of defendants' original brief as containing material not a part of the record on appeal. After reviewing the record, we have determined that plaintiffs' motion has merit. We hereby grant plaintiffs' motion to strike and order footnote one of defendants' original brief stricken from the record.
[4] In Posecai, concerned that the lower courts were reading Harris v. Pizza Hut of Louisiana, Inc., 455 So.2d 1364 (La.1984), too broadly, we cautioned that a business does not assume a duty to protect its customers from the criminal attacks of third persons merely by undertaking some security measures. Posecai, 99-1222 at 10, 752 So.2d at 769 n. 7. This case is factually distinguishable from both Pizza Hut and Posecai because rather than undertake some security measures, the Bank in this instance adopted a comprehensive security plan, a portion of which was clearly directed at providing security to customers.
[5] We note Deputy Williams testified he patrolled the rear of the Bank eight to ten times a night.