**Donald ST. PETERS**

v.

**HACKBARTH DELIVERY SERVICE INC. and Walgreen Company**

**NO. 16–CA–88**

Court of Appeal of Louisiana, Fifth Circuit.

December 07, 2016

COUNSEL FOR PLAINTIFF/APPELLANT, DONALD ST. PETERS, W. Paul Wilkins

COUNSEL FOR DEFENDANT/APPELLEE, HACKBARTH DELIVERY SERVICES Thomas J. Solari

COUNSEL FOR DEFENDANT/APPELLEE, CONTINENTAL CASUALTY COMPANY Wade A. Johnson

Panel composed of Jude G. Gravois, Robert M. Murphy, and Hans J. Liljeberg

GRAVOIS, J.

Plaintiff, Donald St. Peters, appeals a summary judgment granted in favor of

---

defendants, Hackbarth Delivery Service, Inc. and Continental Casualty Company, dismissing his suit for damages against Hackbarth and Continental Casualty. For the following reasons, we reverse the trial court's grant of summary judgment and remand the matter for further proceedings.

## FACTS AND PROCEDURAL HISTORY

Hackbarth is a company that specializes in the movement of customer goods between the point of origin and the point of consumption while providing warehousing for those goods when necessary. CPS Logistics, Inc. contracted with Walgreen Company ("Walgreens") to transport and deliver Walgreens' merchandise, including pharmaceutical drugs and products, to regional warehouses, in this case, to Hackbarth's warehouse facility in St. Rose, Louisiana. Mr. St. Peters, a "line haul" driver employed by CPS with approximately seventeen years of truck-driving experience, regularly delivered line haul shipments of Walgreens' prescription drugs from Illinois to Hackbarth's St. Rose warehouse facility.[1] He picked up his subject load of Walgreens' pharmaceutical goods in Illinois, and accompanied by another driver, drove straight to Hackbarth's St. Rose facility to deliver the cargo.

The delivery had a regular, previously scheduled arrival time of early Saturday morning, May 9, 2009. Mr. St. Peters and the other CPS driver arrived around 4:30 a.m.[2] Because no Hackbarth employee was present at that time to take the delivery, Mr. St. Peters waited in the parking lot of the warehouse. Around 5:00 a.m., Melvin Anderson, the scheduled Hackbarth employee, arrived to open the warehouse to accept the delivery. Unbeknownst to Mr. St. Peters, three to four [2]robbers armed with guns, including an assault rifle, had arrived before him and lay in wait to intercept and steal the Walgreens' shipment of pharmaceuticals. Mr. Anderson directed Mr. St. Peters to back his truck into a bay. As he was doing so, at least one of robbers was "buzzed" into the warehouse by Mr. Anderson, who did not ask him for identification and who admitted that the low lighting prevented him from seeing that person well prior to entry. When Mr. St. Peters entered the warehouse lobby, he was accosted by the armed robbers, who allegedly physically harmed him and threatened him with death, tied his wrists, and eventually locked him and Mr. Anderson in the ransacked Walgreens' trailer, where they remained for several hours until they were discovered by other Hackbarth employees arriving at the warehouse later that morning.[3]

After this incident, Mr. St. Peters was diagnosed with post-traumatic stress disorder. As a result, he was unable to continue employment as a line haul driver. He sought therapy and treatment for his physical and mental injuries. He eventually found employment as a certified nursing assistant, a position that minimizes his exposure to people and conditions that trigger manifestations of his post-traumatic stress disorder condition, including anxiety attacks.

1.  "Line haul" as defined by Hackbarth means long distance shipments of pharmaceutical goods, including prescription drugs and controlled substances.

2.  The record reflects that the other driver, identified as Paul Slagley, was asleep in the sleeping compartment of the truck when the truck arrived at Hackbarth's St. Rose warehouse facility and apparently slept through the entire incident in question.

3.  The record reflects that the robbers took items from both the Hackbarth warehouse and the Walgreens' trailer.

On May 5, 2010, Mr. St. Peters filed a petition for damages against Hackbarth and Walgreens,[4] alleging that Hackbarth owed Mr. St. Peters a legal duty to exercise reasonable care to protect its invitees such as him by keeping its premises in a safe condition suitable for its intended use as a secure pharmaceutical product warehousing facility, that defendants had not taken adequate steps to provide for security measures to protect against foreseeable criminal acts of third parties targeting pharmaceutical products routinely transported and/or stored by defendants, and that defendants breached their duty to Mr. St. Peters by, among other things, failing to provide adequate security to protect Mr. St. Peters from foreseeable criminal conduct of third parties. On July 2, 2014, Mr. St. Peters filed an amended and supplemental petition for damages, naming The Cincinnati Insurance Company and Continental Casualty Company, allegedly the liability insurers of Hackbarth, as additional defendants to the action.

On July 24, 2015, Hackbarth filed a motion for summary judgment, arguing that Mr. St. Peters would not be able to bear his burden of proof at trial that Hackbarth had a duty to protect him from the criminal acts of third persons such as these robbers. Hackbarth argued that the attack in question was not reasonably foreseeable due to a lack of similar criminal activity at the St. Rose warehouse location. In support of its motion for summary judgment, Hackbarth introduced evidence consisting of police reports of past criminal activity, both at the office park in general and at the Hackbarth warehouse specifically, that showed no prior incidents of armed theft of line hauls from the warehouse. Hackbarth also introduced corporate deposition testimony of the security measures in place at the warehouse, which consisted of closed circuit television, flood lighting, visitor entry point controls, employee entry point controls, access control procedures, real time response to security system alarms, intruder alarm system, and "documented security procedures."

On August 17, 2015, Continental Casualty, as alleged liability insurer of Hackbarth, also filed a motion for summary judgment, adopting the motion for summary judgment, memorandum, and exhibits of Hackbarth, seeking a dismissal of Mr. St. Peters' suit with prejudice at his cost.

Mr. St. Peters opposed the motions for summary judgment, arguing that the likelihood of this crime was clearly foreseeable to Hackbarth based upon deposition testimony from several key Hackbarth employees and documentary evidence that showed Hackbarth knew that line hauls in general were particularly vulnerable to armed robbery at "resting points," such as warehouses where the cargo was unloaded. Mr. St. Peters argued that the evidence he introduced shows that following a similar robbery incident at Hackbarth's Tuscaloosa, Alabama, warehouse in 2008, Hackbarth

4. In Mr. St. Peters' suit, "Walgreen Company" was named as a defendant; however, the suit was answered by "Walgreen Louisiana Co., Inc.," with the assertion therein that Mr. St. Peters had incorrectly referred to this defendant as "Walgreen Company" in his petition. On August 25, 2014, the trial court signed a judgment dismissing CPC Logistics, Inc., as plaintiff-in-intervention, and Walgreen Company and Walgreen Louisiana Co., Inc., as defendants-in-intervention, on the basis that all claims involving these parties had been amicably settled and compromised, and dismissing all claims involving these parties in their entirety, with prejudice. On December 1, 2014, on joint motion of Mr. St. Peters, Walgreen Company, and Walgreen Louisiana Co., Inc., the trial court signed a judgment dismissing Walgreen Company and Walgreen Louisiana Co., Inc. in their entirety from the suit with prejudice.

recognized the vulnerability of its line hauls to targeted criminal activity and as a result implemented specific safety protocols to be observed by drivers and warehouse personnel when delivering a line haul, which protocols were additional security measures over and above existing ones, including lighting and cameras. He further argued that the evidence he submitted showed that these procedures were not followed at Hackbarth's St. Rose warehouse on the day he made his delivery, nor were they generally observed at this warehouse on Saturdays, the day of the week Mr. St. Peters normally made his scheduled delivery.

Mr. St. Peters' evidence in opposition to the motion for summary judgment highlighted the nature of the warehouse business in general and the specific nature and risks that follow line haul shipments. He argued that the evidence he presented in opposition to the motion for summary judgment established that the nature of Hackbarth's business of transporting large amounts of pharmaceutical goods across state lines to regional warehouses makes it reasonable for the courts to consider, as a factor of determining foreseeability, criminal activity pertaining to cargo shipments beyond the specific location of the St. Rose warehouse. He further argued that his evidence also established Hackbarth's acknowledgment that its line hauls faced a serious and real threat of theft by armed robbers, both as the shipments traveled and at the delivery points, including delivery to Hackbarth's warehouses. He also argued that Hackbarth's general knowledge of the location and frequency of crime targeting line haul shipments was shown by its use of Freight Watch publications, a service used by the industry to track crime targeted at long distance cargo shipments. He thus argued that Hackbarth had a duty to protect him from the criminal acts of third persons such as these

robbers and breached that duty. As such, he argued summary judgment should be denied.

In opposition to the motion for summary judgment, Mr. St. Peters introduced a document disseminated by Hackbarth internally and to line haul companies entitled "Arriving Pharmaceutical Shipment Policy—Line haul Security Procedures," which implemented special security procedures applicable to line hauls. These procedures were put in place after the hijacking of a line haul cargo at Hackbarth's Tuscaloosa, Alabama warehouse in 2008. The document included the following statements:

> **The following procedures are intended to strongly enhance our company's pharmaceutical line hauls security processes. This security Policy is in addition to existing line haul security processes and procedures.**
>
> **We shall always assume that our line hauls are targeted, the criminal element is waiting for the opportunity to hijack our vehicles. Failure to follow this policy exposes our company to financial losses and jeopardizes the safety of our drivers.**

(Emphasis in the original.)

The policy outlines "Standard Security Process for Line haul arrival at our operations/hubs," which included detailed timed communications between the driver, the security person at the warehouse as the cargo approached, and the "service center," in order to make sure the terminal was safe before drivers arrived with a shipment, and that the shipment could be safely unloaded and warehoused. He argued that the evidence introduced shows that these procedures were not followed on the occasion of Mr. St. Peters' delivery at St. Rose on May 9, 2009, which allowed the robbers to gain access to the ware-

house, accost Mr. St. Peters, and steal his cargo.

Mr. St. Peters also offered the deposition testimony of several key Hackbarth personnel regarding Hackbarth's knowledge of the risks following line hauls that the new line haul security procedures were meant to address. Sean Sweet, Kelly Picard, Van Davis (security officer with Hackbarth and La. C.C.P. art. 1442 corporate designee), and Kevin Deem all agreed that Hackbarth understood the risk of hijacking that attached to its pharmaceutical loads and that this risk included harm to drivers and employees. The line haul procedures described in the above noted document were devised after the Tuscaloosa robbery, were made specifically in response to it, and applied to all warehouse locations, not just the Tuscaloosa warehouse where the previous hijacking took place. Mr. Davis testified that the risk of hijacking was "unbelievable" when a line haul was on the road. Mr. Deem stated that "any pharmaceutical line haul in the country is definitely a potential target" and that the risk "follows the shipment," *i.e.*, it is not tied to a particular resting location.

Mr. St. Peters further argued that his deposition testimony introduced into evidence describing the incident and that of Hackbarth personnel established that few or none of the safety procedures outlined in the "Arriving Pharmaceutical Shipment Policy – Line haul Security Procedures" were followed by Hackbarth warehouse personnel on the day of his delivery. The requirements that all employees and drivers were to wear uniforms and identification badges, and that authorized employees were to positively identify drivers and other visitors to the terminals before allowing them to enter, were not followed on May 9, 2009, as confirmed by Nicole Randolph, who was the acting terminal manager of St. Rose and also one of Hackbarth's regional managers. Nor were two Hackbarth employees present to accept delivery of the load, which was also required following the Tuscaloosa theft. That such procedures were not routinely followed on Saturdays in general was confirmed by the deposition testimonies of Mr. Anderson and Ms. Randolph. Ms. Randolph additionally noted that it would be readily apparent, to an aspiring robber, that Saturdays were the easiest day to carry out a robbery because far fewer Hackbarth warehouse personnel were present on Saturdays than during the week (at least 20 on Monday through Friday as opposed to perhaps only two on Saturdays). Mr. St. Peters argued that the failure to follow these procedures apparently led to Mr. Anderson allowing a person that he could not and did not identify properly into the warehouse which ultimately resulted in the commission of the robbery in question.

The trial court heard the motions for summary judgment on October 19, 2015 and took the matter under advisement. After considering the motions, Mr. St. Peters' opposition thereto, and Hackbarth's reply to the opposition, the trial court rendered judgment in favor of Hackbarth and Continental Casualty on November 2, 2015, dismissing Mr. St. Peters' suit against said parties with prejudice.

In granting summary judgment in favor of Hackbarth and Continental Casualty, the trial court recognized that under *Posecai v. Wal–Mart Stores*, 99–1222 (La. 11/30/99), 752 So.2d 762, 768, the most important factor to be considered in deciding whether a business owes a duty of care to protect its customers from the criminal acts of third parties is the existence, frequency and similarity of prior incidents of crime on the premises, but the location, nature and condition of the property

should also be taken into account. The trial court then found:

> ... Here, Defendant's Exhibit A established that from 2006 and 2009 there were 119 reports of criminal activity in James Business Park, St. Rose, Louisiana. The incidents were relatively minor in nature and none involved armed robbery or the use of a firearm to the extent used by the criminal offenders in this case. Notably, of the 119 reports, only four incidents were specific to the Hackbarth facility and none involved an armed robbery at the warehouse.

The trial court went on to rule:

> As recited in *Posecai, supra*, a duty to protect from criminal acts of others arises under limited circumstances only—when the criminal act in question was reasonably foreseeable to the owner of the business. Plaintiff has the burden of establishing the duty that the defendant owed under the circumstances.
>
> All things considered, the Court does not find that the element of foreseeability of an armed robbery at the St. Rose location is supported by the evidence herein. Therefore, there is no genuine issue of matter [sic] fact as to whether the defendant owed a duty to protect plaintiff. Defendant is entitled to judgment as a matter of law.

This timely appeal followed.

## ANALYSIS

Appellate courts review a district court's grant of summary judgment *de novo*, viewing the record and all reasonable inferences that may be drawn from it in the light most favorable to the non-movant. *Parish of Jefferson v. Davie Shoring, Inc.*, 14–701 (La.App. 5 Cir. 2/11/15), 167 So.3d 925, 929, citing *Bourgeois v. Boomtown, LLC of Delaware*, 10–553 (La.App. 5 Cir. 2/15/11), 62 So.3d 166, 169. The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions, together with the affidavits, if any, admitted for purposes of the motion for summary judgment, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law. La. C.C.P. art. 966.

Summary judgment procedure is intended to make a just and speedy determination of every action. La. C.C.P. art. 966. It is favored and the procedure shall be construed to achieve this intention. *Id.* Under La. C.C.P. art. 966, the initial burden is on the mover to show that no genuine issue of material fact exists. If the moving party points out that there is an absence of factual support for one or more elements essential to the adverse party's claim, action or defense, the non-moving party then must produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial. La. C.C.P. art. 966(C)(2). If the non-moving party fails to do so, there is no genuine issue of material fact, and summary judgment should be granted. La. C.C.P. arts. 966 and 967; *Paternostro v. Wells Fargo Home Mortg., Inc.*, 09–469 (La.App. 5 Cir. 12/8/09), 30 So.3d 45, 49.

In *Posecai, supra*, 752 So.2d at 765–766, the Supreme Court adopted a duty-risk analysis to determine whether liability exists under the particular facts presented, explaining as follows:

> ... Under [the duty-risk] analysis, the plaintiff must prove that the conduct in question was the cause-in-fact of the resulting harm, the defendant owed a duty of care to the plaintiff, the requisite duty was breached by the defendant and the risk of harm was within the scope of protection afforded by the duty breached. Under the duty-risk analysis, all four

inquiries must be affirmatively answered for plaintiff to recover.

A threshold issue in any negligence action is whether the defendant owed the plaintiff a duty. In deciding whether to impose a duty in a particular case, the court must make a policy decision in light of the unique facts and circumstances as presented. The court may consider various moral, social, and economic factors, including the fairness of imposing liability; the economic impact on the defendant and on similarly situated parties; the need for an incentive to prevent future harm; the nature of defendant's activity; the potential for an unmanageable flow of litigation; the historical development of precedent; and the direction in which society and its institutions are evolving.

(Citations omitted.)

With respect to deciding whether business owners owe a duty to protect their patrons from crimes perpetrated by third parties, the court in *Posecai* emphasized that "there is generally no duty to protect others from criminal activities of third parties. This duty only arises under limited circumstances, when the criminal act in question was reasonably foreseeable to the owner of the business. Determining when a crime is foreseeable is therefore a critical inquiry." *Id.*, at 766. (Citation omitted.) The court went on to adopt the "balancing test" to determine foreseeability of criminal activity, stating that "[t]he balancing test seeks to address the interests of both business proprietors and their customers by balancing the foreseeability of harm against the burden of imposing a duty to protect against the criminal acts of third persons." *Id.*, at 767. In adopting the balancing test, the court stated:

With the foregoing considerations in mind, we adopt the following balancing test to be used in deciding whether a

business owes a duty of care to protect its customers from the criminal acts of third parties. The foreseeability of the crime risk on the defendant's property and the gravity of the risk determine the existence and the extent of the defendant's duty. The greater the foreseeability and gravity of the harm, the greater the duty of care that will be imposed on the business. A very high degree of foreseeability is required to give rise to a duty to post security guards, but a lower degree of foreseeability may support a duty to implement lesser security measures such as using surveillance cameras, installing improved lighting or fencing, or trimming shrubbery. The plaintiff has the burden of establishing the duty the defendant owed under the circumstances.

The foreseeability and gravity of the harm are to be determined by the facts and circumstances of the case. The most important factor to be considered is the existence, frequency and similarity of prior incidents of crime on the premises, but the location, nature and condition of the property should also be taken into account. It is highly unlikely that a crime risk will be sufficiently foreseeable for the imposition of a duty to provide security guards if there have not been previous instances of crime on the business' premises.

*Id.*, at 768.

In *Pinsonneault v. Merchs. & Farmers Bank & Trust Co.*, 01–2217 (La. 4/3/02), 816 So.2d 270, at 277–78, the Supreme Court explained its holding in *Posecai*, to-wit:

... As we cautioned in *Posecai*, while the existence, frequency, and similarity of prior incidents of crime on the premises is an important consideration in the duty determination, other factors, such as the location, nature, and condition of

the property should also be taken into account. *Posecai* in no way implies, nor should it be interpreted to imply, that a business' duty to protect customers from the criminal attacks of third persons does not arise until a customer is actually assaulted on the premises. To the contrary, *Posecai* recognizes, and we reiterate, that while businesses are generally not responsible for the crime that haunts our communities, "business owners are in the best position to appreciate the crime risks that are posed on their premises and to take reasonable precautions to counteract those risks."
(Citing *Posecai, supra*, at 768.)

On appeal, Mr. St. Peters argues that the trial court erred in only considering evidence of past criminal activity reported at Hackbarth's St. Rose location while disregarding all other surrounding evidence, in contravention of the Supreme Court's ruling in *Pinsonneault* which requires the court to look to the crime risk related to the nature of the business conducted as appreciated by the business owner in establishing the foreseeability of criminal activity. He further argues that genuine issues of material fact exist as to whether Hackbarth should have reasonably foreseen the occurrence of the criminal act such that it owed a duty to Mr. St. Peters from the third-party criminal conduct in question, and whether Hackbarth breached the duty it owed to protect Mr. St. Peters from such third-party criminal conduct.

In response on appeal, Hackbarth and Continental Casualty assert that "there are no material issues of fact in this case as pertains to the duty issue," and that the existence of a duty is a legal question not a factual one. They further argue that the trial court properly applied "the balancing test" espoused in *Posecai* in finding that Hackbarth had did not have a duty as a

matter of law to protect Mr. St. Peters from the harm suffered.

In its ruling, as evidenced by its reasons for judgment, as noted above, the trial court found that Hackbarth had no duty to protect Mr. St. Peters from this criminal incident because it was not reasonably foreseeable, ostensibly due to the lack of similar criminal incidents at Hackbarth's St. Rose warehouse. In so ruling, it appears that the trial court focused exclusively on the lack of past similar crime at the Hackbarth warehouse and the office park premises to determine that the armed theft of the line haul was not reasonably foreseeable. The trial court's reasons for judgment do not indicate that the trial court considered the Supreme Court's opinion in *Pinsonneault* which further explained the balancing test adopted in *Posecai*. As noted above, both *Posecai* and *Pinsonneault* hold that although the existence, frequency and similarity of prior incidents of crime on the premises may be the most important factor for the trial court to consider, it is not the only factor, and that the location, nature, and condition of the property should also be taken into account. These cases further provide, as noted above, that "while businesses are generally not responsible for the crime that haunts our communities, *'business owners are in the best position to appreciate the crime risks that are posed on their premises and to take reasonable precautions to counteract those risks.'* " *Pinsonneault, supra*, at 277–78, citing *Posecai, supra*, at 768. (Emphasis added.)

*Pinsonneault* involved the tragic and senseless murder of a bank customer while he was attempting to deposit his employer's daily receipts in the bank's night deposit box. In determining whether the bank had a duty to protect its customer from the criminal incident in question, the court reviewed the bank's existing security

plan and particular aspects of the layout of the bank property and improvements and its surroundings. After also considering the only two prior incidents of robbery at the particular bank branch in question (neither of which involved an attack on a customer using the night deposit box), along with local and national statistics on crime at night deposits, the court found that the bank, like the business owner in *Posecai*, did not possess the requisite foreseeability for the imposition of a duty to employ *heightened* security measures for the protection of patrons of its night depository. *Pinsonneault, supra,* at 277. It agreed, however, with the lower courts' finding that certain security precautions on the bank's premises were warranted. After examining the bank's existing security plan, the court found that it had "no difficulty determining that the defendant bank had a duty to implement reasonable security measures." *Id.,* at 278. The court's inquiry did not stop there, however, as the court went on to find that although the bank had a duty to implement reasonable security measures to protect its night deposit customers from criminal acts of third parties, the trial court's determination that the |13bank did not breach its such duty to its customer was reasonable under the facts and circumstances presented. *Id.,* at 282.

Upon *de novo* review of Hackbarth's motion for summary judgment, Mr. St. Peters' response thereto, and Hackbarth's reply, including all of the attachments thereto, we find that the trial court erred as a matter of law in its application of the balancing test adopted by the Supreme Court in *Posecai* and *Pinsonneault*. Although the evidence presented by Hackbarth clearly established that no prior incidents of armed theft of goods had ever occurred at its St. Rose warehouse and the

office park where it is located, the trial court's reasons for judgment indicate that it failed to adequately consider the evidence presented by Mr. St. Peters concerning whether Hackbarth should have reasonably foreseen the occurrence of the criminal acts in question in determining whether Hackbarth had a duty to protect Mr. St. Peters from such third-party criminal conduct, including the following compelling evidence presented by Mr. St. Peters, to-wit:

- Hackbarth's use of Freight Watch publications, a service used by the industry to track crime targeted at long distance cargo shipments.

- Hackbarth's "Arriving Pharmaceutical Shipment Policy – Line haul Security Procedures" document which implemented special security procedures applicable to line hauls that Hackbarth disseminated internally and to line haul companies, within which such document Hackbarth acknowledged: **"We shall always assume that our line hauls are targeted, the criminal element is waiting for the opportunity to hijack our vehicles. Failure to follow this policy exposes our company to financial losses and jeopardizes the safety of our drivers."** (Emphasis in the original.)

- Hackbarth's "Standard Security Process for Line haul arrival at our operations/hubs," contained in its Arriving Pharmaceutical Shipment Policy, which included the requirement of detailed timed communications between the driver, the security person at the warehouse as the cargo approached, and the "service center," in order to make sure that the terminal was safe before drivers arrived with a shipment, and that the shipment could be

safely unloaded and warehoused.[5]

● The deposition testimony of several key Hackbarth personnel regarding Hackbarth's knowledge of the risks involving line hauls that the new line haul security procedures were meant to address, and the implementation of the line haul procedures described in its Arriving Pharmaceutical Shipment Policy that were devised by Hackbarth after the Tuscaloosa robbery, made specifically in response to it, and applied to all warehouse locations, not just the Tuscaloosa warehouse where the previous hijacking took place.

● The deposition testimony as to whether these security procedures were followed on the occasion of Mr. St. Peters' delivery at St. Rose on May 9, 2009, including the requirements that all employees and drivers were to wear uniforms and identification badges, that authorized employees were to positively identify drivers and other visitors to the terminals before allowing them to enter, whether two Hackbarth employees were present to accept delivery of the load, which were also required following the Tuscaloosa robbery, and whether such procedures were not routinely followed on Saturdays in general, although Mr. St. Peters' delivery in question was a regularly scheduled early Saturday morning delivery.

● The deposition testimony concerning the failure to follow Hackbarth's security procedures which apparently led to Mr. Anderson allowing a person that he could not and did not identify properly into the warehouse which ultimately resulted in the commission of the robbery in question.

In so ruling, we are guided by the Supreme Court's analysis in *Pinsonneault*, wherein although the court found that no prior incidents of robbery of night deposit box customers had taken place at the particular branch bank in question, the court nevertheless considered local and national statistics of robberies of customers of bank night deposit boxes in finding that the bank did not have a duty to employ *heightened* security measures for the protections of patrons of its night deposit box.

In summary, considering Hackbarth's admitted knowledge that its "line hauls are targeted," and that "the criminal element is waiting for the opportunity to hijack our vehicles," and viewing the record and all reasonable inferences that may be drawn from it in the light most favorable to Mr. St. Peters, the non-movant, including Hackbarth's apparent knowledge of the risk involved and the safety protocols it promulgated at its warehouses, including its St. Rose warehouse, to counter such risk, we find that the trial court erred as a matter of law in its application of the balancing test adopted by the Supreme Court in *Posecai* and *Pinsonneault* when it failed to adequately consider the compelling evidence presented by Mr. St. Peters concerning whether Hackbarth should have reasonably foreseen the occurrence of the criminal acts in question in determining whether Hackbarth had a duty to protect Mr. St. Peters from such third-party criminal conduct. Accordingly, we find that

---

**5.** Hackbarth also argues in brief that its "Arriving Pharmaceutical Shipment Policy—Line haul Security Procedures" was designed to protect only those drivers who were directly employed by Hackbarth, not drivers such as Mr. St. Peters who were employed by other companies. However, none of the evidence submitted by either Hackbarth or Mr. St. Peters suggests that the foreseeable risks of harm appertained only to line hauls made by drivers employed directly by Hackbarth or that line hauls made by drivers such as Mr. St. Peters were subject to less risk or different risks.

Hackbarth is not entitled to judgment as a matter of law at this time.

## CONCLUSION

For the foregoing reasons, the trial court's grant of summary judgment in favor of Hackbarth and Continental Casualty is reversed. The matter is remanded to the trial court for further proceedings.

**REVERSED AND REMANDED**