830 So.2d 526 (2002)
Ladundee A. ADAMS, et al., Plaintiffs-Appellants,
v.
Anthony Joseph TRAINA, Jr., et al., Defendants-Appellees.
No. 36,306-CA.
Court of Appeal of Louisiana, Second Circuit.
October 25, 2002.
*527 William Michael Cady, William M. Cady, III for Appellants.
Douglas Leon Stokes, Jr., Jonesboro, for Appellee, Anthony Traina, Jr.
John F. Frederickson, Judith Milke, Assistant Attorney Generals, for Appellee, State of Louisiana, DPSC.
Belton, Houck & Associates, by John F. Belton, Ruston, for Appellee, Freddie Hampton.
Kean, Miller, Hawthorne, D'Armond, McCowan & Jarman, L.L.P., by John Francis Jakuback, Baton Rouge, Melissa A. Hemmans, for Appellee, Town of Jonesboro.
Elijah Walton, In Proper Person.
Before BROWN, WILLIAMS and DREW, JJ.
BROWN, C.J.
This was a bifurcated bench trial. At the conclusion of plaintiff's case on liability, the trial judge granted defendants' motions for involuntary dismissal pursuant to C.C.P. art. 1672. We reverse and remand.
In doing so, we hold that a premises owner can be liable in tort for failing to take reasonable measures to protect its invitees from harm caused by the criminal acts of third parties. The harm must be foreseeable and preventable by the exercise of reasonable care. We conclude that the trial court was clearly wrong in holding that the harm was not foreseeable to the premises owner in this case under the facts and circumstances presented. We find that plaintiff presented enough evidence to carry his burden of proof. On remand, the premises owner will have the opportunity to rebut plaintiff's evidence.
Further, the trial court found that the acts or omissions of the town and state were not a cause-in-fact of plaintiff's harm. Again, we conclude that the trial court was clearly wrong inasmuch as plaintiff's proof showed that both the town and state had knowledge of the violations of licensing laws and the violent atmosphere created by this unlicensed operation. On remand, the town and state will also have the right to rebut plaintiff's evidence.
Plaintiff has not appealed from the trial court's grant of the motions for involuntary dismissal of the intentional tortfeasors, Freddie Hampton and Elijah Walton. Defendants, however, filed an answer to plaintiff's appeal, assigning as error the trial court's dismissal of Hampton and Walton. We reverse the dismissals of these parties as well.

Discussion
On March 12, 1994, at approximately 1:00 a.m., plaintiff, LaDundee Adams, while leaving the Ebony Club Disco in Jonesboro, Louisiana, was shot in the parking lot. An altercation between different parties started on the dance floor inside the club and then proceeded outside into the parking lot with numerous shots being fired, one striking Adams, who was not involved in the fight on the dance floor or outside in the parking lot. As a result of the shooting, Adams was severely wounded and is now a paraplegic.
In an action tried by the court without a jury, after the plaintiff has completed the presentation of his evidence, a party may move for a dismissal of the action on the ground that, upon the facts and law, the plaintiff has not shown a right to relief. The court may then determine the facts *528 and render judgment against the plaintiff and in favor of the moving party, or may decline to render any judgment until the close of all the evidence. La.C.C.P. art. 1672(B).
An appellate court should not reverse an involuntary dismissal based on article 1672(B) in the absence of manifest error. Cupples v. Pruitt, 32,786 (La.App.2d Cir.03/01/00), 754 So.2d 328, writ denied, 00-0945 (La.05/26/00), 762 So.2d 1108; Silva v. Calk, 30,085 (La.App.2d Cir.12/10/97), 708 So.2d 418; Poland v. Glenn, 623 So.2d 227 (La.App. 2d Cir.1993), writ denied, 629 So.2d 1171 (La.1993).
Liability of Anthony Traina
Plaintiff sought to recover from defendant, Anthony Joseph Traina, Jr., owner of the premises upon which the shooting occurred, based upon his failure to provide security for the parking lot which was used by patrons of the businesses in his building.
Involuntary Dismissal
The liability of a business/property owner such as Anthony Traina, as well as the liability of public entities such as the State of Louisiana and the Town of Jonesboro, for purposes of La.C.C. art. 2315, is determined according to the traditional duty-risk analysis. Pinsonneault v. Merchants & Farmers Bank & Trust Co., 01-2217 (La.04/03/02), 816 So.2d 270; Hardy v. Bowie, 98-2821 (La.09/08/99), 744 So.2d 606; Mundy v. Dept. of Health and Human Resources, 620 So.2d 811 (La.1993). Under this analysis, the plaintiff must prove that the defendant owed a duty of care to the plaintiff, the requisite duty was breached by the defendant, the conduct in question was the cause-in-fact of the resulting harm, and the risk of harm was within the scope of protection afforded by the duty breached (legal duty). Posecai v. Wal-Mart Stores, Inc., 99-1222 (La.11/30/99), 752 So.2d 762; Berry v. State through Dept. of Health and Human Resources, 93-2748 (La.05/23/94), 637 So.2d 412. Under the duty-risk analysis, all four inquiries must be affirmatively answered for plaintiff to recover. Posecai, supra; LeJeune v. Union Pacific Railroad, 97-1843 (La.04/14/98), 712 So.2d 491.
In Posecai, supra at 766, the supreme court held that while business owners generally have no duty to protect others from the criminal acts of third persons, "they do have a duty to implement reasonable measures to protect their patrons from criminal acts when those acts are foreseeable." Determining when such criminal acts are foreseeable is a critical inquiry in the duty equation. Pinsonneault, supra; Posecai, supra. This inquiry is answered by use of a balancing test.
The foreseeability of the crime risk on the defendant's property and the gravity of the risk determine the existence and the extent of the defendant's duty. The greater the foreseeability and gravity of the harm, the greater the duty of care that will be imposed upon the business. A very high degree of foreseeability is required to give rise to a duty to post security guards, but a lower degree of foreseeability may support a duty to implement lesser security measures such as using surveillance cameras, installing improved lighting or fencing, or trimming shrubbery. The plaintiff has the burden of establishing the duty the defendant owed under the circumstances.
The foreseeability and gravity of the harm are to be determined by the facts and circumstances of the case. The most important factor to be considered is the existence, frequency and similarity of prior crimes on the premises, but the location, nature and condition of the property should also be taken into account. It is highly unlikely that a crime risk will be sufficiently foreseeable for *529 the imposition of a duty to provide security guards if there have not been previous instances of crime on the business' premises.
Pinsonneault, 816 So.2d at 276, citing Posecai, 752 So.2d at 768.
The Ebony Club is in the same building as Traina Oil Co. Anthony Traina does business as Traina Oil Co. and owns the land and building. The Ebony Club is located at the south end of the rectangular building and Traina Oil Co. is located at the north end; there is a clothing store between the two businesses. A car wash operated by Traina is on the northwest end of the parking lot.
The Ebony Club is a "bottle club," which means that alcohol may be consumed, but not sold, there. Traina Oil Co. is a "package store," licensed to sell beverages of both low and high alcoholic content, but not licensed for on-site consumption. Typically, patrons of the Ebony Club would purchase liquor, beer and wine from Traina Oil Co., which they would then consume either in the Ebony Club or in the parking lot.
From 1978 to 1985, Traina held a Class A license for on-site consumption of alcoholic beverages. Traina opened the Ebony Club as a bar in 1978, but closed the club after only three months. Traina kept his Class A on-site consumption license until 1984. At that time, he obtained a license for package sales for Traina Oil Co. but did not renew his on-site consumption license. Also at that time, the Ebony Club was opened as a bottle club.
A series of tenants renting on an unwritten, week-to-week basis operated the Ebony Club. Traina received a specific sum as rent and profited from the beer, wine and liquor sales to Ebony Club customers. Traina also bought and placed in the club coin-operated devices such as pool tables, a Pac-Man machine and a juke box. Profits from the coin-operated machines were split equally with the club's "tenant."
Traina paid the utilities and insurance for the building, including those for the Ebony Club. There were no fences, curbs, markings, or any other form of separation in the parking lot. Customers of the package store parked in front of the Ebony Club and vice versa. Traina testified that Ebony Club patrons frequented both businesses.
Except for his personal presence, Traina did not have any security for the package liquor store or parking lot. Traina typically worked from 8:00 a.m. to 4:00 p.m. After that, he testified that he had "no idea what anyone did on his property." Traina, however, admitted to trouble with people drinking and fighting in the parking lot. He also conceded that there had been shootings "on occasion" in the parking lot and a stabbing in the Ebony Club. Traina acknowledged that there was another shooting after the one which precipitated this lawsuit.
Traina testified that he knew there was drinking in the parking lot, but "they're well aware that they're not supposed to." Rather than employ security, he would call the Jonesboro police if he noticed or became aware of drinking in the parking lot. We again note that Traina usually went home in the afternoon at four o'clock.
Plaintiff introduced evidence that, during the two years immediately prior to March 12, 1994, there were 25 police reports of violence in the parking lot of Traina's building, 24 of which involved gunplay. He also introduced into evidence more than 60 additional police reports of disturbances or altercations which did not involve guns or knives.
Delois Robinson testified that she, her husband Earl, and their three children, have lived across the street from Traina *530 Oil Co. and the Ebony Club since the 1970's. Their home is directly across from the liquor store. Mrs. Robinson testified that there was loitering, profanity, loud music, fighting and urinating on Traina's premises. There were also shootings in the parking lot as well as in front of the building. Mrs. Robinson testified that for many years, the shootings across the street scared her so much that on Thursday, Friday and Saturday nights, she and her three children slept on the floor. Her husband, Earl Robinson, talked to Traina on several occasions about the problem. He also complained to the Mayor of Jonesboro and the police, but nothing was done. He went to Nathaniel Zeno, his alderman (Zeno is actually a member of the police jury) about the problem.
Nathaniel Zeno stated that he works for Jackson Parish School Board as an instruction supervisor and also serves on the police jury. He and his family have lived across the street from Traina's property for more than 30 years. Around 1975-1978, Zeno began having problems with activities in the parking lot across the street from his home, including profanity, loud music, drinking, urinating, shootings and fights. As already noted, Traina applied for and received his first retail liquor permit in the mid-70's. On two occasions, Zeno was in his yard and saw people in the parking lot firing weapons. On another occasion, someone discharged a weapon and the pellets hit his fence.
Zeno testified that he complained to the authorities about the activities on Traina's property. He recalls writing a letter to the state "alcohol board" as well as a letter to the town. He got no response to either letter. Zeno also testified that he called the police department at least once a week, complaining of the noise, shooting and other activities going on in Traina's parking lot. Zeno had appeared at a Jonesboro town council meeting and made a statement regarding the problems on Traina's property, but got no relief until LaDundee Adams was shot. At that point, a number of other citizens got involved and shortly thereafter the Ebony Club was closed.
Around 9:30 p.m. on Friday, March 11, 1994, LaDundee Adams and three friends, Stevie Bee, Keeshana Brown and Bonita Kimble, went to the Ebony Club. Ms. Kimble purchased liquor from Traina Oil Co. and the four friends entered the Ebony Club.
The girls went their own way and Adams and Stevie Bee "hung out" by the pool tables. During the evening, Adams had two drinks and ate two hot dogs. Shortly before midnight, the D.J. announced "last call for alcohol," as Traina Oil Co. closed at midnight; however, the Ebony Club remained open.
Adams decided to leave the club around 1:00 a.m. He testified that he was aware of a disturbance on the dance floor at the opposite end of the bar, but did not know who was involved or what the fight was about. Adams bought another hot dog on his way out.
The disturbance on the dance floor was a fistfight whose initial participants were Freddie "Pokie" Hampton of Arcadia and Xavier "Roani Belton" Cowans of Jonesboro. Cowans testified that he and his friends were known as the "Troublemakers." Cowans had spent the evening of the incident drinking beer and "chilling" with his "buds." He noted that Adams was not one of his "buds," but he did consider him to be a friend. Several of Cowans' friends jumped into the fight on the dance floor against Hampton. Manford "Man" Woodard (now deceased), who was employed by the Ebony Club as inside security, broke up the fight and threw Hampton out the exit door into the parking lot. Woodard, who did not know *531 Hampton by name, noted in his deposition that he knew him as "that little troublemaker from Arcadia."
After starting the fight, Cowans went out the side door into the parking lot, grabbed his brother's gun, and "reacted, just reacted." After Hampton was thrown out into the parking lot, Cowans fired the first shot at Hampton, who then returned fire. Another "dude" from Jonesboro ("Cakeman," who is now deceased), standing at the corner of the building, also started shooting. Cowans laid down behind a car in the parking lot. Cowans testified that he didn't see anyone at the exit door shooting. Cowans believed that it was his fault that Adams got shot.
Hampton testified that he was out on the dance floor with one of his girlfriend's friends when Cowans came up to him, hit him in the face and the fight was on. Several of Cowans' friends jumped on him and it was "15 to 1" (him being the one). When the fight broke up, Hampton noted that "nothing but my pride" was injured.
Hampton testified that when he left the building, he saw two guys with guns who told him they were going to kill him. His brother Tracy and friend Elijah Walton were to his left. Hampton asked his brother to unlock the truck so he could get his pistol. As he was reaching for his gun, he heard the first shot, and he fired back while standing between Elijah's truck and another car in the parking lot. According to Hampton, none of his shots hit anyone. As he was squatted down between the two vehicles, he could hear bullets hitting Elijah's truck. He raised up to shoot back and got shot in the chest. When he was out of bullets, he started to run, noting that it was a "suicide mission" to just sit in the parking lot with no bullets. As he was running, he got hit in the leg and foot.
According to Hampton, there were shots coming from the building and parking lot. He claimed that people were still shooting when the police arrived. Hampton testified that the fight happened because he was not from Jonesboro. He also believes that the incident was gang-related.
Elijah Walton testified that he was with Tracy and Freddie Hampton. The three men, who were from Arcadia, decided to go to Jonesboro to the Ebony Club. Walton had his gun and Pokie (Hampton) had his weapon. Both men left their guns in Walton's truck before going into the club. When the fight broke out on the dance floor, Walton went out to the parking lot to get his gun. Tracy came out of the club, then Hampton. Walton asked Hampton what was up and decided he wanted to get in on the fight. He got Hampton's gun out of the truck and gave it to him.
As Walton was walking back to the club, he heard a gun shot and took cover behind a car. He doesn't know who fired the shot. Walton began shooting and got shot in the ribs. Both Walton and Hampton testified that LaDundee Adams was not involved in the fight. Neither one knew how or why Adams got shot, just that he was in the wrong place at the wrong time.[1] Police found approximately 35 spent shell casings at the scene.
LaDundee Adams testified that he decided to go home around 1:00 a.m. He bought a third hot dog and walked to the "pay door" on the south end of the club intending to go out but was told to leave via the "exit door" on the east side of the building. Still carrying his hot dog, Adams walked back past the pool tables *532 and left the club as directed. As he left the club, Adams noticed two men that he did not know, behind him and to his left. Adams turned south and began walking along the wall toward his grandmother's house. At this point, Cowans and Hampton were already out in the parking lot getting ready to "shoot it out."
As Adams walked along the wall, still holding his hot dog, he saw Cowans standing behind a vehicle in the parking lot and Keeshana Brown standing on the other side of the car. Ms. Brown made a pointing gesture and said something to Adams. He was unable to hear what she said, but he turned to look in the direction that she was pointing. As he turned, he was shot in his side. He didn't hear the shot, but did hear the bullet strike his body. After that, he doesn't remember much of what happened. Adams was certain, however, that he did not hear shots until after he was hit. As a result of the shooting, Adams is now a paraplegic.
In light of the above evidence and jurisprudential guidelines, we find that plaintiff established by a preponderance of the evidence that Traina had a duty to provide security for his building's parking lot and that he breached his duty by failing to implement any security measures whatsoever for the lot. Furthermore, plaintiff's evidence established that Traina's failure to provide security was a cause-in-fact of his injuries and that the risk that plaintiff, a patron of the "bottle club" in Traina's building, would be shot as he exited the Ebony Club by bar customers "shooting it out" in the parking lot was clearly within the scope of protection afforded by Traina's duty to provide security. Traina simply stuck his head in the sand.
Therefore, we find that the trial court committed manifest error in granting Traina's motion for involuntary dismissal. Obviously, our decision is based upon the plaintiff's case and defendants will have the opportunity to present contradictory evidence.
Liability of the Town of Jonesboro and the State of Louisiana
Plaintiff's claims against the town and state are for negligent inspection and negligent licensing. The trial court, after considering all of the evidence presented by plaintiff, concluded that these defendants' actions or failures to act were not a cause-in-fact of plaintiff's injuries.
The cause-in-fact component of the duty-risk analysis relates to the causal connection between defendants' alleged wrongful conduct and plaintiff's injury. Juneau v. Strawmyer, 94-0903 (La.App. 4th Cir.12/15/94), 647 So.2d 1294. The relevant inquiry is whether plaintiff's harm would have occurred "but for" defendants' substandard conduct. Perkins v. Entergy Corp., 00-1372 (La.03/23/01), 782 So.2d 606; Kniepp v. City of Shreveport, 609 So.2d 1163 (La.App. 2d Cir.1992), writ denied, 613 So.2d 976 (La.1993).
Where there are concurrent causes of an accident, the proper inquiry is whether the conduct in question was a substantial factor in bringing about the harm or injuries. Perkins, supra; Jones v. Hawkins, 98-1259, 98-1288 (La.03/19/99), 731 So.2d 216; Rick v. State, Dept. of Transportation & Development, 93-1776, 93-1784 (La.01/14/94), 630 So.2d 1271; Morrison v. Kappa Alpha PSI Fraternity, 31,805 (La.App.2d Cir.05/07/99), 738 So.2d 1105, writs denied, 99-1607, 99-1622, 99-1668 (09/24/99), 749 So.2d 634, 635, 1120. While a party's conduct does not have to be the sole cause of the harm, it is a necessary antecedent essential to an assessment of liability. Lasyone v. Kansas City Southern Railroad, 00-2628 (La.04/03/01), 786 So.2d 682; Netecke v. State ex rel. DOTD, 98-1182 *533 (La.10/19/99), 747 So.2d 489. For example, the complained of conduct is a cause-in-fact of plaintiff's injury when the harm would not have occurred without it. Id.; Theriot v. Lasseigne, 93-2661 (La.07/05/94), 640 So.2d 1305. This differs from legal duty which determines whether for policy reasons liability should extend to cover this harm.
Whether defendants' conduct was a substantial factor in bringing about plaintiff's harm, and thus a cause-in-fact of the injuries, is a factual question to be determined by the factfinder and thus governed by the manifest error/clearly wrong standard. Perkins, supra; Netecke, supra; Methvin v. Ferguson, 35,138 (La.App.2d Cir.09/26/01), 796 So.2d 712.
According to plaintiff, "Traina Oil Co., the Ebony Club and the surrounding parking lot was one big, unregulated barroom with a history of violence going back many years." Furthermore, alleges plaintiff, the separation between Traina and the "operators" of the Ebony Club was a sham designed to circumvent the Alcohol Beverage Control laws.
The evidence presented by plaintiff supports these assertions, and we would go so far as to say that this set-up did not fool anyone, much less the local law enforcement or state ABC authorities. The town and state were grossly remiss in their licensing and inspecting duties. The town and state's renewal of and/or failure to revoke Traina's package liquor license and failure to inspect his retail outlet led to the free-wheeling, wild west operation of the Ebony Club and the shooting of plaintiff. Not only should the town and state authorities have recognized the danger involved, they in fact did. Neither, however, acted, but continued to drive by with "a wink and a smile."
As a state agency charged with regulating and controlling the sale and consumption of alcoholic beverages and as a municipality charged with enacting and enforcing municipal regulations related thereto, neither the ABC nor the Town of Jonesboro fulfilled its legally required duty. Earl and Delois Robinson, Nathaniel Zeno and other residents of this neighborhood deserved better. The duty to protect and serve was forgotten. The foreseeability of harm and ease of association between the town and state's duty to protect the public and what happened in this case is an easy connect. Both cause-in-fact and legal duty were shown. The trial court was clearly wrong in granting these defendants' motions for involuntary dismissal. As with the other defendants, the state and town will have a chance to present evidence to support their respective positions.

Conclusion
For the reasons set forth above, the trial court's judgment is reversed and the matter is remanded for completion of the trial. Costs are apportioned among defendants as allowed by law.
REVERSED and REMANDED.
NOTES
[1] Patricia Beard, an employee of the Ebony Club, also testified that LaDundee Adams was not involved in either the fistfight or shooting.