908 So.2d 1282 (2005)
Maple PATTON, Plaintiff-Respondent
v.
Stevenson STROGEN, II, Stevenson Strogen, Geneva Strogen, Anthony G. Davis, Linden Asset Management Co., Lee Jeter, ABC Insurance Company, DEF Insurance Company and XYZ Insurance Company, Defendants-Applicants.
No. 39,829-CW.
Court of Appeal of Louisiana, Second Circuit.
August 17, 2005.
*1284 Hicks, Hubley, Marcotte & Rhodes by Lydia M. Rhodes, Shreveport, for Plaintiff.
Cook, Yancey, King & Galloway by Sidney E. Cook, Jr., Matthew R. May, Shreveport, for Defendant-Applicant Linden Asset Management Company.
William G. Nader, for Defendants-Respondents Stevenson Wayne Strogen II, Stevenson Wayne Strogen & Geneva Strogen.
Before GASKINS, DREW and LOLLEY, JJ.
LOLLEY, J.
After the shooting death of her 18-year-old son Shamocus Patton, Maple Patton filed suit against a number of persons and entities she alleged were responsible for his murder. The instant dispute concerns the liability of one of these defendants, Linden Asset Management Company ("Linden"). Linden, the owner of a part of the property where the shooting took place, filed a motion for summary judgment on the issue of its liability for Shamocus' death. The Twenty-Sixth Judicial District Court, Parish of Bossier, State of Louisiana, denied the motion, and Linden sought supervisory review. For the following reasons, we affirm the judgment of the trial court.

FACTS
Linden is the owner of North Market Plaza, a shopping center situated on the west side of North Market Street, a busy four-lane highway with a center turn lane in Shreveport, Louisiana (the "shopping center"). The shopping center sits on the west side of a large parking lot extending eastward toward North Market Street. There are two stand-alone businesses in the parking lot near the center of the eastern edge fronting North Market, the Taco Bell being one of them. Linden does not own a Taco Bell or that restaurant's parking lot, which is partially separated from the shopping center parking lot by a concrete divider approximately 6" high and 12" wide. Station One, a popular teen club, was the northernmost tenant in the shopping center. The club, through its owner, Anthony Davis, leased its building from Linden.
On the evening of Friday, August 25, 2000, the club was open and, as usual, was full to capacity with patrons. In addition, the large shopping center parking lot was completely full of cars belonging to club patrons, as well as would-be club patrons. According to Shreveport Police Department ("SPD") Officer Daniel Atkins, Station One was a club that police routinely had "all type of problem[s] with every weekend. Basically fighting, shooting, basic drive-by shooting and stuff like that." He described the parking lot crowd as a "gang environment." The officer said that the club itself had hired three or four off-duty SPD officers to work security on the weekend. In addition, SPD assigned additional on-duty officers to watch the area as well.
The overflow crowd from the club often spilled into the nearby Taco Bell, onto North Market itself and across North Market Street to the Texaco on the east side of the street. Officer Atkins said that "just by driving through [on Friday and Saturday night] the crowd was so large the people couldn't hardly come through on North Market for the kids walking across the street and loitering on the parking lot." The officer said that police had been trying to get the club to close because there had been "a bunch of major accidents there." In the past, SPD had closed off some of the entrances to the shopping center parking lot for further control.
In Officer Atkins' opinion, the owner of the club had not provided enough security *1285 for crowd control in the parking lot. Officer Atkins had in the past personally made some misdemeanor arrests in the shopping center parking lot; he said the arrestees were "speeding, spinning their cars around, fighting, basically disorderly." However, no weapons were involved in the arrests made by Officer Atkins.
Earlier on the evening of August 25, 2000, someone from the Taco Bell called police complaining of an unruly group of teens on the restaurant's lot. There also had been an auto accident on the shopping center parking lot that night. Officer Atkins arrived at the scene at about 11:30 p.m. in his marked police unit for "police visibility" "so they can hold down the trouble." There were three other police officers in the shopping center parking lot when Officer Atkins arrived, and the officer described the parking lot as "very well lit." In reference to a question about the physical features of the parking lot, the officer described it as "very safe" considering the lighting. Officer Atkins said that none of the teens on the lot were looking at the car wreck, they were "pretty much just walking around, hanging around the cars, playing loud music, going in and out of Taco Bell; just basically hanging on the parking lot." He described the lot as "packed" and said "we barely had room to turn."
After driving through the shopping center parking lot, Officer Atkins pulled into the Taco Bell parking lot. When he pulled in, Shamocus was walking through that parking lot, as was Marcus Green, another teenager. Apparently, earlier that evening, Green and 17-year-old Stevenson Strogen, II got into an argument at a high school football jamboree in Bossier Parish. After the game, Green drove to the shopping center parking lot, where he went to the Taco Bell restaurant. Strogen and an adult companion, Lee Jeter, followed Green to the restaurant. Officer Atkins drove his patrol car through the Taco Bell parking lot and had driven around the restaurant to the exit side of the small lot when he suddenly heard shooting. In his deposition, he described the chaotic scene this way:
And there was a group of kids, a bunch of kids on the lot. And all of a sudden shooting, they just started shooting. And kids started running everywhere. They was hiding under my car, around it, they was jumping over the hood. I couldn't tell where the shooting was coming from. So with me trying to find some cover and find out where the shooting, it was just so many kids, I couldn't tell where it was coming from at the time.
* * *
[F]irst we had tried to find out who the shooter was, but all the kids was running and we couldn't tell exactly who the shooter was until we talked to some witnesses.
But I do know the shooter did walk by. He passed by me, he passed by another police officer that was working the wreck, and committed  and did this shooting because I was right on the lot when he did it.
It was later determined that Strogen was the shooter. He evidently got his gun  a Hi-Point 9mm pistol  from Jeter's car and concealed the weapon under his clothing as he walked across the shopping center parking lot. Strogen stood in the shopping center parking lot and fired across the divider into the crowd standing on the Taco Bell parking lot.[1] Police found spent shell casings on both the shopping center parking lot and on the Taco Bell parking *1286 lot. Although Marcus was the intended victim, Shamocus was struck by one of the bullets and tragically killed.
The night of the shooting was evidently the last night that the Station One club was open. Strogen was later convicted of second degree murder.[2] In this civil litigation, Patton sued a number of defendants, including Linden. Linden answered the lawsuit and later filed a motion for summary judgment which was unsuccessful. Linden subsequently filed a second motion for summary judgment with an array of supporting documentation, including the deposition of Officer Atkins referenced herein. Also included was an affidavit from Linden's assistant vice-president stating in part that Linden had no knowledge of any shootings or attempted shootings on the shopping center parking lot from 1991 until this event and that Linden had not received any complaints about the Station One club or about the troubles on the shopping center parking lot.
Linden also presented the affidavit of its expert witness, Merlyn D. Moore, a professor of criminal justice at Sam Houston State University in Texas. Moore reviewed a wide variety of exhibits in relation to the shopping center and opined that there were no crime patterns at the location that would make this crime foreseeable. Moore further concluded, in his opinion, that this particular crime, an attempted revenge killing, is not the type of crime that is foreseeable at a particular location.
The trial court heard Linden's second motion and concluded that a genuine issue of material fact existed as to whether the crime was foreseeable so as to impose a duty on Linden to protect Shamocus. Linden sought supervisory review of that ruling, and this court granted a writ of certiorari to ensure that all of the record was before us for review.

DISCUSSION
As stated, Linden seeks review of the denial of its motion for summary judgment. In that regard, Linden raises two assignments of error, arguing specifically that the shooting of Shamocus was not sufficiently foreseeable to impose a duty on Linden to protect Shamocus.

Summary Judgment
The motion for summary judgment is a procedural device to avoid a full-scale trial when there is no genuine issue of material fact. Daugherty v. Magnolia Estates of Vicksburg, Inc., 39,587 (La.App. 2d Cir.04/06/05), 900 So.2d 227. Summary judgment procedure is designed to secure the just, speedy and inexpensive determination of every action; the procedure is favored and shall be construed to accomplish these ends. La. C.C.P. art. 966 A(2); Racine v. Moon's Towing, 2001-2837 (La.05/14/02), 817 So.2d 21.
Summary judgment shall be rendered if the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits show that there is no genuine issue of material fact and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966. The mover has the burden of establishing the absence of a genuine issue of material fact. The burden of proof remains with the movant. If, however, the movant will not bear the burden of proof at trial on the matter before the court on the motion for summary judgment, the movant's burden on the motion does not require him to negate all essential elements of the adverse party's *1287 claim, action or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action or defense. La. C.C.P. art. 966(C)(2). Thus, because it would not have the burden of proof at trial, Linden need only point out an absence of proof in Patton's case on any required element to prevail. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact. Argonaut Great Cent. Ins. Co. v. Hammett, 39,024 (La.App. 2d Cir.11/17/04), 887 So.2d 704, writ denied, XXXX-XXXX (La.02/25/05), 894 So.2d 1151. Specifically:
[a] "genuine issue" is a "triable issue." More precisely, "[a]n issue is genuine if reasonable persons could disagree. If on the state of the evidence, reasonable persons could reach only one conclusion, there is no need for a trial on that issue. Summary judgment is the means for disposing of such meretricious disputes." In determining whether an issue is "genuine," courts cannot consider the merits, make credibility determinations, evaluate testimony or weigh evidence. "Formal allegations without substance should be closely scrutinized to determine if they truly do reveal genuine issues of fact."
A fact is "material" when its existence or nonexistence may be essential to plaintiff's cause of action under the applicable theory of recovery. "[F]acts are material if they potentially insure or preclude recovery, affect a litigant's ultimate success, or determine the outcome of the legal dispute." Simply put, a "material" fact is one that would matter on the trial on the merits.
Smith v. Our Lady of the Lake Hosp., Inc., 93-2512 (La.07/05/94), 639 So.2d 730, 751 (citations omitted).
Despite the legislative mandate that summary judgments are now favored, factual inferences reasonably drawn from the evidence must be construed in favor of the party opposing the motion and all doubt must be resolved in the opponent's favor. Row v. Pierremont Plaza, L.L.C., 35,796 (La.App. 2d Cir.04/03/02), 814 So.2d 124, writ denied, XXXX-XXXX (La.08/30/02), 823 So.2d 952, citing, Willis v. Medders, 2000-2507 (La.12/08/00), 775 So.2d 1049; Independent Fire Ins. Co. v. Sunbeam Corp., 1999-2181, 1999-2257 (La.02/29/00), 755 So.2d 226.
Appellate courts review summary judgment de novo, using the same criteria that govern the trial court's consideration of whether summary judgment is appropriate. Taylor v. Rowell, 1998-2865 (La.05/18/99), 736 So.2d 812.

Foreseeability of the Shooting
This is a negligence case which is resolved by employing a duty-risk analysis involving five elements, those being that: (1) the defendant's conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (2) the defendant had a duty to conform his conduct to a specific standard (the duty element); (3) the defendant's conduct failed to conform to the appropriate standard (the breach element); (4) the defendant's conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) the plaintiff suffered actual damages (the damages element). Goins v. Wal-Mart Stores, Inc., XXXX-XXXX (La.11/28/01), 800 So.2d 783. The threshold question in any duty-risk analysis is whether the defendant owed a duty to the plaintiff, and whether a duty is owed is a question of law. Pinsonneault v. Merchants *1288 & Farmers Bank & Trust Co., 2001-2217 (La.04/03/02), 816 So.2d 270.
Whereas business owners are not the insurers of their patrons' safety, they do have a duty to implement reasonable measures to protect their patrons from criminal acts when those acts are foreseeable. Posecai v. Wal-Mart Stores, Inc., XXXX-XXXX (La.11/30/99), 752 So.2d 762. However, there is generally no duty to protect others from the criminal activities of third persons. Posecai, citing Harris v. Pizza Hut of Louisiana, Inc., 455 So.2d 1364, 1371 (La.1984). This duty only arises under limited circumstances, when the criminal act in question was reasonably foreseeable to the owner of the business. Id.
Determining when such criminal acts are foreseeable is a critical inquiry in the duty equation. Adams v. Traina, 36,306 (La.App. 2d Cir.10/25/02), 830 So.2d 526, writs denied, 2002-2844, 2002-2898 (La.02/07/03), 836 So.2d 101-02, citing Posecai, supra and Pinsonneault, supra. As stated by the Posecai court:
The foreseeability of the crime risk on the defendant's property and the gravity of the risk determine the existence and the extent of the defendant's duty. The greater the foreseeability and gravity of the harm, the greater the duty of care that will be imposed on the business. A very high degree of foreseeability is required to give rise to a duty to post security guards, but a lower degree of foreseeability may support a duty to implement lesser security measures such as using surveillance cameras, installing improved lighting or fencing, or trimming shrubbery. The plaintiff has the burden of establishing the duty the defendant owed under the circumstances. The foreseeability and gravity of the harm are to be determined by the facts and circumstances of the case. The most important factor to be considered is the existence, frequency and similarity of prior incidents of crime on the premises, but the location, nature and condition of the property should also be taken into account. It is highly unlikely that a crime risk will be sufficiently foreseeable for the imposition of a duty to provide security guards if there have not been previous instances of crime on the business' premises.
Id. at 768.
In the instant case, Shamocus was not a patron of the Station One nightclub, nor was he using the premises owned by Linden. The victim was a patron of the adjoining Taco Bell, an entity not legally related to Linden. Nonetheless, the shooter was standing on Linden's property when he killed Shamocus Patton, and this court has applied the Posecai/Pinsonneault standard to landowners/lessors. See Smith v. AAA Travel Agency, 37,728 (La.App. 2d Cir.10/29/03), 859 So.2d 286, writs denied, XXXX-XXXX, XXXX-XXXX (La.02/06/04), 865 So.2d 731, 735.
As explained in Posecai, before a duty can even be imposed on the landowner or lessor, it must be determined whether the criminal act in question was reasonably foreseeable. Thus, the preliminary question as to the foreseeability of the criminal act must be addressed. Here, in addressing that precise issue, the trial court determined that a genuine issue of material issue existed as to this preliminary question. We agree.
For the most part, the cases cited by Linden applying the Posecai/Pinsonneault analysis can be factually distinguished. We do note that in Adams, supra, this court reversed the grant of an involuntary dismissal of a lawsuit against a lessor for a shooting in the parking lot. The nightclub in that case had no security whatsoever *1289 even though the owner was aware that there had been shootings at the location in the past. Indeed, in the two years prior to the shooting in Adams, there had been reports of violence in the parking lot, most of which involved gunplay. Nearby citizens had repeatedly complained to authorities about the problem. This court concluded that a full trial was needed to determine whether the owner's failure to provide security was a substantial factor in bringing about the shooting.
Linden argues that there had been very little violent crime on its property prior to this incident. However, the fact that the shopping center parking lot itself, for the most part, was relatively crime-free prior to Patton's murder, is not the only question to determine Linden's duty to those on its property. Whereas the existence, frequency, and similarity of prior incidents of crime on the premises is an important consideration in the duty determination, we must take into account other facts, such as the location, nature, and condition of the property. Pinsonneault, supra at 277. Further, neither Posecai or Pinsonneault imply that:
a business' duty to protect customers from the criminal attacks of third persons does not arise until a customer is actually assaulted on the premises. To the contrary, ... while businesses are generally not responsible for the crime that haunts our communities, `business owners are in the best position to appreciate the crime risks that are posed on their premises and to take reasonable precautions to counteract those risks.'
Pinsonneault, supra at 277-78, quoting Posecai, supra at 768.
Here, there is sufficient evidence to create a question of fact as to whether Linden reasonably should have foreseen the shooting of Shamocus. There is no dispute that the Shreveport Police Department regularly and consistently patrolled the shopping center parking lot, as well as the Taco Bell parking lot solely due to the presence of Linden's tenant, Station One. The SPD were not on the premises primarily to control traffic in the parking lot. Officer Atkins repeatedly stated that the police were present for "crowd control" purposes. Notably, "control" is defined as: to exercise restraining or directing influence over, i.e., regulate; to have power over, i.e., rule; to reduce the incidence or severity of especially to innocuous levels, i.e., control an insect population or control a disease. See Merriam-Webster Online Dictionary.2004. http://www.merriam-webster.com (5 July 2004). Controlling this crowd reasonably included restraining it from criminal acts or behavior, a crowd which was known to engage regularly in fighting and disorderly conduct.
We note that there was a very large, late-night crowd of older teenagers congregating regularly outside of this nightclub. It is undisputed that the SPD presence was necessary, in addition to the private security force employed by Station One, to "control" this crowd. We also consider the following:
 the crowd was a "gang environment";
 there was shooting in the area "pretty much every weekend";
 the police were having a "problem because of this teen club";
 it was "routine every weekend" with the police to "keep an eye on Station One";
 concerns by police regarding "kids ganging up, partying on the outside of the club and the fighting, and the loitering on the parking lot....";
 the tremendous crowd on the shopping center parking lot made it more difficult for Officer Atkins to see Strogen as he approached the victim; and

*1290  the large crowd hindered the investigation afterwards.[3]
Considering this evidence, there exists a question of fact as to whether Linden should have reasonably foreseen such criminal actions under these limited and specific circumstances. We are not answering the question as to whether this particular act was foreseeable, but only that considering the nature of the crowd in Linden's parking lot that night and the experiences the SPD had with it, there is a factual inference reasonably drawn in favor of Patton as to whether Linden should have foreseen the type of incident that occurred. Clearly a question of fact exists which would best be considered by a factfinder at a trial of the issue. Only after considering the question of the foreseeability of the criminal act, can the duty/risk analysis be completed. Therefore, with the precise facts at hand, we conclude that the trial court properly determined the issue of foreseeability was a fact in dispute making summary judgment inappropriate. See Scott v. Pack, 609 So.2d 243 (La.1992), where the Louisiana Supreme Court summarily reversed as "not appropriate" the summary judgment affirmed in Scott v. Pack, 607 So.2d 738 (La.App. 1st Cir.1992).

CONCLUSION
Considering the foregoing, the trial court did not err in concluding that the issue of foreseeability by Linden as to Shamocus Patton's shooting was a genuine issue of material fact. Costs of this appeal are assessed to Linden Asset Management Company.
AFFIRMED.
GASKINS, J., concurs without reasons.
NOTES
[1] Linden concedes this fact for purposes of this appeal.
[2] See State v. Strogen, 35,871 (La.App. 2d Cir.04/03/02), 814 So.2d 725, writ denied, XXXX-XXXX (La.12/13/02), 831 So.2d 983.
[3] See Deposition of Officer Atkins, Exhibit "A."