999 So.2d 811 (2008)
STATE in the Interest of JA and JA.
No. 43,998-JAC.
Court of Appeal of Louisiana, Second Circuit.
December 3, 2008.
*812 John B. Smitherman, for Appellant, Janeen Anderson.
Tommy J. Johnson, Shreveport, Warren G. Mangham, for Appellee, State of Louisiana, DOSS.
Joseph C. Seyler, Baton Rouge, for Appellees, JA and JA.
George E. Harp, Shreveport, for Appellee, Jacques (Joe) Francouer.
Before BROWN, WILLIAMS and LOLLEY, JJ.
WILLIAMS, J.
Janeen Anderson appeals a judgment of disposition finding that her children, JA and JA, are children in need of care and continuing their custody with the Department of Social Services. For the following reasons, we affirm the juvenile court's ruling.

FACTS
On January 28, 2008, the Department of Social Services, Office of Community Services ("OCS"), received a report of physical abuse from the staff of the Around the Clock Daycare Center ("the center") with regard to JA, a four-year-old female. A member of the center's staff had observed bruises on the lower back and buttocks of the four-year-old girl and had noticed that the child "was walking like she was hurting." When questioned about the bruises, the child stated, "My mommy did that." When Janeen Anderson, the child's mother, arrived at the center, the director of the center questioned her, and she admitted to spanking the child. OCS was called but Anderson left with the four-year-old girl and her two-year-old son, who also attended the center, before the OCS worker arrived. The center did not have a current address for the family and efforts by the police to determine the family's whereabouts were unsuccessful.
The children were later returned to the center. On February 12, 2008, the center's staff noticed bruises on the face of JA, the two-year-old boy.[1] The four-year-old reported that her mother had hit the two-year-old child. She also reported that the mother's boyfriend, "Joe," had touched her with his finger on her "private area," pointing to her vagina.
An OCS worker interviewed the four-year-old child, who stated that Anderson had slapped her and her two-year-old brother in the face because they had gone into the kitchen and gotten some banana pudding. The four-year-old also stated that she had a "bo bo" on her right arm and that she "always have bruises from my mommy." The child also reported that Joe "whips me with a belt and locks me in the room," and that Anderson "lets him hit on us." The child further stated, "I don't have clothes on when Joe spanks me and *813 touches me," and she pointed between her legs. The worker observed bruises on the child's face which were healing.
The OCS worker also interviewed the two-year-old, who stated, "My mommy slapped me in the face for going in her purse." The child pointed to the right side of his face. The two-year-old also stated that Anderson had "whipped" his sister with a spoon and had put a bruise on her "butt." He stated that Joe "whips me with a belt." The OCS worker observed bruises on the two-year-old's face.
The center's staff was also interviewed by the OCS worker. The staff reported that the four-year-old had informed them that Anderson had slapped her and that Joe had touched her inappropriately. Staff members also admitted that "children always came to the center with bruises on them."
The OCS worker also interviewed Anderson. According to OCS, Anderson stated that she did not see any bruises on her daughter on January 28, 2008 and did not remember whether or not she had spanked the child that day. Anderson admitted that she physically disciplined her children but denied allowing Joe to do so unless she was present. She also denied ever leaving the children alone with Joe. She stated that her children sustained bruises "from being active." She also stated that the two-year-old had gotten the bruise on his face from falling off of the porch. Anderson further stated that her daughter had not told her that Joe had touched her inappropriately.
On February 14, 2008, OCS filed a petition for an emergency instanter order, alleging physical and sexual abuse. The OCS requested that the order be issued, granting temporary custody of the children to OCS. The juvenile court issued the order and the children were placed in OCS custody. A hearing was held on February 19, 2008 and the trial court found reasonable grounds for continued OCS custody. On March 12, 2008, the state filed a petition requesting the court to find the children in need of care, pursuant to LSA-Ch.C. arts. 601, et seq. A contested adjudication hearing was held on April 24, 2008, and the court took the matter under advisement. On June 10, 2008, the court ruled that the evidence supported an adjudication that the children were in need of care and continued custody of the children with OCS. Following a disposition hearing held on July 2, 2008, the court continued the children in OCS custody. The court approved a case plan submitted by OCS, which, inter alia, required the mother to undergo a psychiatric evaluation. This appeal followed.

DISCUSSION
Anderson contends the juvenile court erred in adjudicating the children in need of care. She argues that OCS failed to meet its burden of proving that the children were in need of care.
LSA-Ch.C. art. 606 sets forth the grounds on which a child can be found in need of care, and provides, in pertinent part:
A. Allegations that a child is in need of care must assert one or more of the following grounds:
(1) The child is the victim of abuse perpetrated, aided, or tolerated by the parent or caretaker, by a person who maintains an interpersonal dating or engagement relationship with the parent or caretaker, or by a person living in the same residence with the parent or caretaker as a spouse whether married or not, and his welfare is seriously endangered if he is left within the custody or control of that parent or caretaker.

*814 * * *
At the adjudication hearing, the State bears the burden of proving by a preponderance of the evidence that the child is a child in need of care. LSA-Ch.C. art. 665.
It is well settled that an appellate court cannot set aside a juvenile court's findings of fact in the absence of manifest error or unless those findings are clearly wrong. In re A.J.F., XXXX-XXXX (La.6/30/00), 764 So.2d 47. In a manifest error review, it is important that the appellate court not substitute its own opinion when it is the juvenile court that is in the unique position to see and hear the witnesses as they testify. Id. Where there is conflicting testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even when the appellate court may feel that its own evaluations and inferences are as reasonable as those of the juvenile court. Id.; see also Rosell v. ESCO, 549 So.2d 840 (La.1989). If the juvenile court's findings are reasonable in light of the record reviewed in its entirety, the appellate court may not reverse, even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. In re A.J.F., supra; See also Pinsonneault v. Merchants & Farmers Bank & Trust Co., 2001-2217 (La.4/3/02), 816 So.2d 270.
Reversal of findings of fact on appeal requires that (1) the appellate court find from the record that no reasonable factual basis exists for the trial court's finding, and (2) the appellate court determine that the record establishes the finding is clearly wrong or manifestly erroneous. Williams v. State ex rel. Dept. of Social Services, 37,923 (La.App.2d Cir.1/28/04), 865 So.2d 908, writ denied, XXXX-XXXX (La.4/8/04), 870 So.2d 276. If there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Stobart v. State, Dept. of Transp. & Dev., 617 So.2d 880 (La.1993).
In the instant case, OCS's petition sought to adjudicate JA and JA as children in need of care based on LSA-Ch.C. art. 606(A)(1). Thus, in order to support this adjudication, the State was required to prove, by a preponderance of the evidence, that the children were the victims of abuse perpetrated, aided, or tolerated by Anderson or by Joe and the welfare of the children was seriously endangered if they were left within the custody or control of Anderson.
At the adjudication hearing, Nina Thomas, an employee at the daycare center, testified that on the day that the abuse was reported, she observed bruises on the four-year-old girl's lower back "and her behind." Thomas stated that there were several "blue, bluish, reddish" bruises covering the child "from her back to her lower behind."
Annie White, the director of the center, testified that on February 12, 2008, she observed that the entire side of the two-year-old child's face was blue. She stated that she had seen other bruises on the child in the past, but the previous incidents were "nothing out of the ordinary." With regard to the four-year-old's bruises, White testified that the bruises were "more than I would consider normal ... all the way down to about the middle part of the back ... all the way down to the buttocks part." White also testified that the four-year-old girl had told her that her mother's boyfriend had touched her "down below." White stated that the girl had stated that she did not like Joe because he had touched her inappropriately. White stated that the children had attended the daycare since they were infants and she had observed Anderson with them and opined that, up until that point, she *815 thought Anderson was a "good, caring mother."
Sandra Green, another daycare center employee, testified with regard to the allegations of sexual abuse of the four-year-old girl. She testified that she observed the girl crying one day and asked her what was wrong. According to Green, the child told her that "her mom's boyfriend had touched her in the spot, and she named the amount of fingers he touched her with and everything, and she said she didn't like it." Green further testified that the child used three fingers to demonstrate how Joe had touched her between her legs. She stated that she knew the child well and she felt that the child was being truthful. Green also testified that she had observed the bruises on the four-year-old child's back and the child had told her that Anderson had spanked her.
Detective Robert Greer of the Caddo Parish Sheriff's Office also testified. He stated that he investigated the complaint with regard to the alleged sexual abuse. Detective Greer testified that he had interviewed Anderson and learned that she and the children practically lived with Joe. He stated that Anderson was agitated during the interview and expressed her belief that the daycare center's staff was "out to get her" and that they had "coerced her children into making these allegations against her." Detective Greer testified that Anderson labeled her children as liars and maintained her opinion that Joe had not done anything wrong. Detective Greer stated that he also interviewed Joe, who admitted to spanking the children on "one or two occasions." He testified that when he asked Joe about the allegations of sexual molestation, he believed that Joe was being deceptive because he "had a big grin on his face when he was talking about it, and his knee was bouncing up and down." The detective admitted that no arrest was made and no criminal charges were filed as a result of the investigation. The detective stated that the district attorney's office had rejected the charges of sexual molestation against Joe "based on the fact that the only evidence was the statement of the child."[2] According to the detective, cruelty to a juvenile remains a viable charge.
Anderson also testified at the hearing. She stated that White had asked her whether she spanked her children and she told her yes. However, Anderson stated that White never questioned her about the bruises on the four-year-old's back. She also stated that she had never witnessed Joe touching the four-year-old inappropriately, and the child had never indicated to her that she had been sexually abused by Joe. She testified that she had never seen Joe spank either of the children and that she did not have a problem leaving the children with Joe, stating, "He's not the type of person that would-I can't see him hurting the kids, and I can't see him hurting me." Anderson also denied that the two-year-old had a bruise that covered the right side of his face. According to her, the bruise was "maybe the size of a nickel." Anderson testified that she never saw the bruises on the four-year-old child's back and buttocks. She testified that the employees of the daycare center were "lying" about the bruises on the children. Anderson also testified that she had no reason to end her relationship with Joe, stating, "He's a kind and loving person." Furthermore, Anderson admitted that she had not complied with the case plan in *816 order to be reunited with her children, stating, "I have not done anything wrong, so I don't see why I would have to."
The court-appointed advocate prepared a report dated July 1, 2008. In the report, the advocate stated that Anderson had indicated that she was "kind of happy the children were in care so that she could travel to train for her new [job]." The advocate also stated that the children "[did] not appear to be very bonded to their mother."
It is clear that the juvenile court heard extensive testimony in this case and weighed the credibility of the witnesses. The trial court noted that the four-year-old child's statements during an interview at the Gingerbread House were consistent with the testimony of the staff of the daycare center. The court also noted that the child's accounts of the abuse remained consistent, despite her young age. Based on our review of the record, we find that the adjudication of the children in need of care was not manifestly erroneous or clearly wrong. We also find no error in the trial court's refusal to return the children to Anderson's custody. By her own admission, Anderson has made no attempt to comply with the case plan and she has expressed that she has no intention of ending her relationship with Joe, despite her daughter's allegations of sexual abuse.

CONCLUSION
For the reasons set forth herein, we affirm the juvenile court's adjudication of the children as children in need of care and the order continuing the children in OCS custody. Costs of this appeal are assessed to the appellant, Janeen Anderson.
AFFIRMED.
NOTES
[1] There was a prior incident involving the two-year-old, when bruises were found on his body. The matter was investigated and deemed invalid.
[2] A criminal background check revealed that Joseph Daniel Anderson had a criminal record for negligent injury, possession of a Schedule II controlled dangerous substance, reckless operation, simple burglary of an inhabited dwelling, driving while intoxicated, simple robbery and simple battery.