STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

NO. 2020 CA 0946

MISS BEE'S SNOWORLD, LLC D/B/A BROOKE'S SNO WORLD,
BROOKE HYDE, AND MICHAEL HYDE

VERSUS

KACI HALE GUIDRY, LEE GUIDRY, THE DUGOUT OF THIBODAUX,
LLC, AND K-LEE SNOWORLD, LLC

*Judgment Rendered:*     JUN 1 8 2021

\* \* \* \* \* \* \* \*

Appealed from the
32nd Judicial District Court
In and for the Parish of Terrebonne
State of Louisiana
Case No. 180288

The Honorable Randall L. Bethancourt, Judge Presiding

\* \* \* \* \* \* \* \*

| | |
|---|---|
| Robert J. Landry | Counsel for Defendants/Appellants |
| Tanner D. Magee | Kaci Hale Guidry, Lee Guidry, |
| Houma, Louisiana | The Dugout of Thibodaux, LLC, and |
| | K-Lee Snoworld, LLC |
| | |
| Gregory J. Schwab | Counsel for Plaintiffs/Appellees |
| Houma, Louisiana | Miss Bee's Snoworld, LLC d/b/a |
| | Brooke's Sno World, Brooke Hyde and |
| | Michael Hyde |

\* \* \* \* \* \* \* \*

BEFORE: THERIOT, WOLFE, AND HESTER, JJ.

*J. WOLFE, concurs*
*by ___.*

**THERIOT, J.**

In this case arising from a business dispute between the parties over a snowball stand franchise, the defendants appeal from the trial court's award of damages and attorney fees to the plaintiffs. For the reasons set forth herein, we affirm.

## FACTS AND PROCEDURAL HISTORY

Since 2008, Brooke Hyde and Michael Hyde have owned and operated Brooke's Sno World, a snowball stand and restaurant in Terrebonne Parish. In 2014, after seeing an ad in the newspaper for Francorp, Inc., a franchise consulting service, Brooke approached Rocky McMillian, a local independent sales representative for Francorp, about franchising Brooke's Sno World. The Hydes decided to contract with Francorp for franchise consulting services and formed a new limited liability company, Miss Bee's Snoworld, LLC, for purposes of the franchise. The services provided by Francorp were to "make the company . . . franchisable," including the preparation of the Franchise Disclosure Document ("FDD") required by federal law,[1] which took several months to complete. In addition to document preparation, Francorp provided franchisor training to its customers. In August of 2014, the Hydes and several Brooke's Sno World employees traveled to Chicago for two days of Francorp franchisor training, where they learned about the process of franchising, marketing, development, and how to train franchisees.

While Francorp was in the process of preparing franchise documents for Brooke's Sno World, the Hydes also hired Rocky, through his newly formed company, RPM Enterprises, to act as their liaison with potential franchisees. Aside from identifying potential franchisees, Rocky's role was to take the reins on the

---

[1] See 16 C.F.R. 436.1 *et seq.*

franchising process to make it as smooth as possible and provide a "turnkey business" to franchisees.

In August 2014, Brooke saw her childhood friend, Kaci Guidry, in the drive-thru line at Brooke's Sno World. Brooke and Kaci had worked at a snowball stand together in high school, and Brooke told Kaci about her plans to franchise Brooke's Sno World. Kaci expressed interest in possibly owning a Brooke's Sno World franchise. Although the franchise documents were not complete, Brooke introduced Kaci to Rocky, and he began working with Kaci as a potential franchisee pending completion of the documents by Francorp. Rocky went over information about the potential franchise with Kaci, gathered necessary information for financing, obtained bids on projects, and prepared equipment and supplier lists for the franchise business. Brooke also introduced Kaci to her banker, and Kaci began working with Russell Touchet at Synergy Bank to obtain financing for the business.

Brooke and Kaci began discussing potential locations for a franchise business, and Brooke suggested Thibodaux, Louisiana as a location because she had observed customers traveling from Thibodaux to visit Brooke's in Houma. Kaci agreed to Thibodaux as the potential franchise location, and Brooke began looking for property. Brooke found a large tract of land in Thibodaux, and after consulting with Kaci and Rocky about the location's suitability as a franchise location, the Hydes purchased the Thibodaux property in October 2014. Although the parties had not yet entered into a franchise agreement, Brooke explained that she wanted to secure this land for the franchise location, so she and Michael went ahead and bought it themselves.

By September or October of 2014, Kaci began visiting Brooke's Sno World once or twice a week for "an hour or so" at a time, and Brooke began teaching her about the business. Although the franchise documents were still not complete,

Brooke testified that she explained to Kaci that everything she showed her would have to be kept confidential, and she had her sign the same confidentiality and non-competition agreement that she requires all of her employees to sign before allowing her into the business.[2] During these visits to the snowball stand, Kaci was able to observe Brooke's business and production processes and the roles of different employees. At Brooke's direction, Kaci paid for and completed the ServSafe Food Protection Manager Certification in October of 2014. By January of 2015, Brooke started "extensive training" with Kaci, which Brooke described as approximately two days a week for four to five hours each day initially, and increasing from February through mid-May to three to four days a week for four to five hours each day. This training was conducted both by Brooke and by her other employees. In contrast to the testimony from Brooke and several Brooke's Sno World employees that they provided in-depth training on all aspects of the business to Kaci over an extended period of time, Kaci denied that she was ever trained at Brooke's. According to Kaci's testimony, she only went to Brooke's Sno World to visit Brooke, and she denied ever seeing Brooke's recipes, food presentation techniques, marketing procedures and strategies, advertising and promotional material, customer lists, or supplier lists.

The Thibodaux property purchased by the Hydes for the franchise was too large to be used strictly for a Brooke's Sno World franchise, so the Hydes had it subdivided into two separate tracts. Thereafter, Kaci signed a purchase agreement on December 19, 2014 to purchase the larger tract for her Brooke's Sno World franchise.[3] Although the original closing date was delayed and the purchase price

---

[2] Kaci's testimony about whether she discussed confidentiality and non-competition agreements with Brooke was inconsistent. She denied that she signed any agreement concerning those topics.

[3] According to Brooke, Kaci specifically requested to buy the larger tract for her franchise so that she could add an outdoor play area.

was renegotiated, the Guidrys ultimately purchased the larger tract from the Hydes on May 15, 2015, for $200,000.00.

In January 2015, Kaci formed a limited liability company for the franchise business, which she named K-Lee's Snoworld, LLC. Over the next few months, Brooke and Kaci proceeded with building plans for the franchise location,[4] obtained building estimates from contractors, began working with the Board of Health and the Fire Marshal, completed the business's tax application, met with suppliers about business cards, menus, and signs, and ordered promotional material for the new location. Kaci continued working with Russell Touchet on financing for the business and testified that she did everything she could to obtain financing. However, she did not complete the application for an SBA loan, and Russell notified her some time in early 2015 that she would not be able to obtain financing at the down payment she requested. Kaci could not recall whether she was offered the opportunity to increase her down payment in order to obtain financing, but she testified that she did not attempt to increase the amount of her down payment in order to secure financing because she could not afford a larger down payment.

The FDD was eventually completed and issued on February 11, 2015, but there is a dispute as to whether it was signed by the parties. Brooke did not see the Guidrys actually sign the documents, since Rocky, in his role as franchisee liaison, was responsible for presenting the FDD to the Guidrys and obtaining signatures; however, Brooke testified that she received a fully executed copy of the FDD back from Rocky in late February 2015. She kept this original in her office files, and Kaci was given a copy as well. Brooke also testified that Rocky collected a partial payment of the franchise fee from Kaci. Brooke did not see this payment, because it was paid directly to Rocky to cover his commission on the deal and was later

---

[4] Kaci testified that she paid $3,500.00 for site adaptation plans.

5

refunded by Rocky when Kaci decided not to proceed.[5] In addition to Brooke's testimony, Amber Verrett, a former Brooke's Sno World employee, testified that she received the original signed FDD for Kaci's franchise from Rocky, and he told her that Kaci also had a copy. Amber was hired to help Brooke with franchising, and her job duties involved obtaining signatures as required on the documents and keeping track of the franchise files. She testified that the document she received from Rocky was fully signed in all places by Kaci, Lee, Brooke, and Rocky, although it may not have been notarized. Amber testified that she put this original document in a file labeled "Kaci and Lee Guidry, K-Lee's Snoworld," which was kept in a filing cabinet drawer marked "Franchise" on the outside. This file was the only file in that drawer at the time. Contrary to this testimony, the Guidrys denied ever signing the FDD, although Kaci admitted that she received a copy of it. She claims that she eventually threw it away when she decided not to move forward. She also denied ever making a payment to Rocky.

The franchise agreement required that Kaci designate a manager for the franchise business, and she designated her sister, Shawna Hale, as manager.[6] Shawna was also a childhood friend of Brooke's, and had worked with Brooke and Kaci at the snowball stand in high school. Because of Shawna's intended

---

[5] Rocky's testimony regarding these events is inconsistent as to whether he presented the FDD to Kaci and obtained signatures on the document. Although he testified in his deposition that he must have gotten the FDD signed if a financing package was completed and he collected a payment from the Guidrys, at trial he testified that he did not present the FDD to Kaci and did not recall obtaining signatures. When asked about the discrepancies in his testimony, Rocky explained that he was "not happy" with Brooke, and felt like she had destroyed his business and his life by making allegations about him after this deal that cost him millions of dollars in business.

[6] Kaci denied ever designating Shawna as a manager for the franchise, representing to anyone that she would be a manager, or sending her for manager training at Brooke's. She also denied at trial that anyone ever suggested that Shawna be a manager, although she previously testified at her deposition that Brooke suggested having Shawna manage the franchise location. However, in two separate emails to Kaci in February 2015, Russell requested Shawna's resume for the financing package. Further, in a November 30, 2015 email to Russell regarding financing for The Dugout, Kaci wrote "Lee, my sister, and myself [sic] will manage the business." Kaci later explained that Russell told her that she had to give a name of someone besides her or her husband who would manage the business, so she used her sister's name "[j]ust for the paperwork."

managerial role, Brooke instructed Shawna to attend ServSafe training, and Shawna successfully completed the ServSafe Food Protection Manager Certification Examination on January 12, 2015.[7] At the end of March of 2015, Shawna started working at Brooke's Sno World, and Brooke began training Shawna for her role as manager of the franchise location, as provided for in the franchise agreement. Brooke testified that Shawna signed the same confidentiality and non-competition agreement all of Brooke's employees sign. Shawna's training at Brooke's, which was conducted by Brooke and her employees, was much more in-depth than training for a regular employee. Because she was going to be a manager, this training included the procedures for opening the business each day, instruction and practice on how to make all of the menu items, how to operate the point of sale and kitchen equipment, how to schedule employees, how to manage inventory, procedures for hiring, customer service, and training employees. Shawna was also given a manual and a booklet of recipes, with pictures and instructions for making menu items, to take home and review, but she denies that she did so.

Shawna continued working at Brooke's until June 7, 2015. On that day, after an argument with a coworker and/or Brooke, Shawna walked off the job and did not return. Later, it was discovered that most of Shawna's employment file and the entire franchise file were missing. There was testimony that Shawna was alone in the office where the franchise and employee files were kept on her last day. Brooke's employee Tycee Showalter was present in the office with Brooke and Shawna on Shawna's last day and confirmed that after their meeting ended, Shawna was the last one out of Brooke's office. Tycee assumed Shawna had followed them out of the office when they returned to the snowball stand, and it

---

[7] Carlotta "Lottie" Landry, who administers the ServSafe training, testified that she only provides training for managers, and it was her understanding that Shawna was being trained to be the manager of the Brooke's franchise.

was approximately an hour before they realized Shawna had not followed them. Amber Verrett, who was not working on June 7, testified that the day after Shawna walked off the job, she noticed that the entire franchise file for the Guidrys was missing from the filing cabinet. Shortly thereafter, she realized that Shawna's employment file was also missing. Despite this testimony, Shawna denied that she took any files or was even in the office on June 7, 2015.

At some point, the Guidrys decided not to move forward with the Brooke's Sno World franchise, although the parties disagree as to when and how Brooke became aware of this decision. Kaci's testimony varied about why she decided not to move forward, but her failure to be approved for financing seemed to be the primary reason. She also testified that she just did not want to do business with Brooke anymore and that she had concerns about several terms in the franchise agreement, but she admitted that she did not raise these concerns with anyone. Kaci testified that at some point, possibly several weeks after Russell Touchet told her that she would not be approved for the financing she needed, she told Brooke by phone that she was not moving forward. Although Kaci could not pinpoint when this call occurred, she was adamant that it was prior to the May 15, 2015 closing on the Thibodaux property. According to Kaci, all parties knew at the time of closing that she was not moving forward, and she only went through with the purchase of the property because she had signed a purchase agreement and she believed Brooke would sue her to enforce the agreement.[8] Brooke, on the other hand, claims that Kaci called her around the second week of June 2015, after she purchased the property and after Shawna walked off the job, and told her that she was not planning to proceed with the franchise business. Brooke insists that she was not aware of Kaci's decision prior to the sale of the Thibodaux property and

[8] Although Kaci alleges that the franchise deal was off and Brooke had been threatening to sue her for a month prior to the May 15, 2015 closing date, Kaci was listed on Brooke's schedule as working or training on April 20, April 22, April 27, and April 30, 2015, and she received a check on May 2, 2015 for a mobile "Snow and Go" job.

that she never would have sold the property to the Guidrys if she had known they were not planning to open a Brooke's Sno World franchise. Russell Touchet testified that he knew prior to the sale of the property that the Guidrys were not moving forward with the franchise and did not want to buy the property, but he did not communicate that information to Brooke and did not know whether Brooke was aware of that fact.

In mid-June 2015, Kaci and Lee decided to open their own snowball stand on the land they had purchased from Brooke, and on July 15, 2015, Kaci formed a new limited liability company for that purpose, called The Dugout of Thibodaux, LLC. Kaci testified that Lee had placed a "For Sale" sign on the Thibodaux property after they purchased it from Brooke, but they did not receive any offers to purchase the land.[9] She denied that Brooke ever asked to buy the property back from them after learning that they were not moving forward with the franchise, and instead insisted that Brooke had forced her to buy the property after being told they were not moving forward. The Dugout opened for business in December 2017, in a building that the Hydes allege was based on the Brooke's Sno World design plans, and with a menu strikingly similar to Brooke's Sno World's menu.

Although there was testimony that Shawna worked for Kaci at The Dugout, Kaci and Shawna testified that Shawna only visited her sister at the business. Kaci denied that her sister ever worked for her or assisted her in running or managing The Dugout, but instead visited her briefly on occasion to provide emotional support and "have fun." Shawna testified that when The Dugout opened, she would stop by every other day or so and stay for four or five hours. While there, Shawna testified that she would prepare food and take pictures to post on Facebook and would occasionally help out by mopping, making ice cream, and bringing food

---

[9] The Guidrys listed the sale price of the land, which they purchased for $200,000.00 from the Hydes in May, as "$275,000 non-negotiable," in order to recoup their expenses from the franchise.

to customers. While she denied that she trained Dugout employees or used any of Brooke's materials to do so, Shawna admitted that she put together illustrated instructions for making menu items for use by employees, similar to what she was given while at Brooke's.

On June 22, 2017, Miss Bee's Snoworld, LLC and the Hydes filed suit against the Guidrys, K-Lee Snoworld, LLC, and The Dugout of Thibodaux, LLC, alleging unlawful use and disclosure of proprietary and confidential information in violation of the Louisiana Unfair Trade Practices Act ("LUTPA"), as well as breach of contract. The petition requested declaratory and injunctive relief,[10] as well as damages and attorney fees. The defendants filed a reconventional demand, seeking damages, costs, and attorney fees for violations of LUTPA by plaintiffs.

A bench trial on the merits was held on December 4-6, 2018 and February 25-26, 2019. At the close of the trial, the trial court ordered the parties to submit post-trial briefs and proposed judgments and took the matter under advisement. More than a year later, the trial court signed a judgment in favor of the plaintiffs in the amount of $35,000.00, plus attorney fees of $20,000.00 and all costs.[11] The trial court attached the plaintiffs' post-trial brief to the judgment, stating that it was adopting the brief as its reasons for judgment.

The defendants appealed, assigning the following trial court errors:

1. The District Court was manifestly erroneous in finding that there was ever a signed franchise agreement.

---

[10] The plaintiffs sought an injunction ordering the defendants to return the plans for the Brooke's Sno World franchise location, as well as any other written information or computer-generated data obtained from Brooke's Sno World. After a hearing on August 9, 2017, a preliminary injunction was granted by consent judgment, pending trial of the matter. The defendants returned the plans in open court, but denied having any other written information or computer-generated data obtained from Brooke's Sno World in their possession. The plaintiffs also sought a declaratory judgment revoking the sale of the Thibodaux property based on error, but later withdrew this claim.

[11] The judgment also made the preliminary injunction permanent and dismissed the reconventional demand with prejudice.

2. The District Court was manifestly erroneous in finding detrimental reliance a viable cause of action in the face of positive statutory writing requirements.

3. The District Court erred in awarding attorney's fees.

## DISCUSSION

### *Existence of an Agreement*

The defendants argue on appeal that the trial court erred in concluding that a franchise agreement existed between the parties, where the plaintiffs failed to produce a signed copy of a written agreement. Although an original document is generally required to prove the content of a writing, an exception to this rule exists under the Code of Evidence. La. C.E. art. 1002. Pursuant to La. C.E. art. 1004, the original is not required and other evidence of the contents of a writing, recording, or photograph is admissible if all originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith. See *Evans v. Graves Pontiac-Buick-GMC Truck, Inc.*, 576 So.2d 1025, 1027-1028 (La.App. 1 Cir. 1991) (finding that since the court did not find that the proponent of the documents destroyed them in bad faith, blank forms were properly admitted into evidence for the purpose of reconstructing the original agreement, with testimony that the blank forms filed in evidence were identical in substance to those destroyed).

In this case, the plaintiffs introduced an unsigned copy of the documents that they allege were executed by the parties. In addition to Brooke's own testimony that the contract was executed, Amber Verrett testified that she saw the fully executed copy of the contract herself and that the contract in evidence was the same as the one executed by the parties. In addition, evidence was offered to support the plaintiffs' assertion that the executed contract was lost, stolen, or destroyed by Kaci's sister, Shawna.

11

Whether an executed contract existed and whether it was lost, destroyed, or stolen are questions of fact. A court of appeal may not set aside a trial court's findings of fact in the absence of manifest error or unless they are clearly wrong. Under the manifest error standard, in order to reverse a trial court's determination of fact, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) determine that the fact finder is clearly wrong or manifestly erroneous. *Stobart v. State through Dept. of Transp. and Development*, 617 So.2d 880, 882 (La. 1993). On review, an appellate court must be cautious not to reweigh the evidence or to substitute its own factual findings just because it would have decided the case differently. *Pinsonneault v. Merchants & Farmers Bank & Trust Co.*, 2001-2217, p. 11 (La. 4/3/02), 816 So.2d 270, 279. Where the trial court's factual determination is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous. *Belanger v. Spencer H. Calahan, L.L.C.*, 2020-0763, p. 8 (La.App. 1 Cir. 4/16/21), — So.3d —, —.

After a thorough review of the evidence contained in the record before us on appeal, we conclude that a reasonable factual basis exists for the trial court's findings that the parties did indeed execute the franchise agreement and that the original was lost, destroyed, or stolen. Further, we cannot say that this conclusion was clearly wrong or manifestly erroneous. Because the trial court found that the original contract was lost, stolen, or destroyed (for which finding there is factual support), parole evidence was permissible to prove its existence and contents. See *In re Succession of Etienne*, 2012-1120, p. 5 (La.App. 4 Cir. 6/5/13), 118 So.3d 1224, 1226. This assignment of error lacks merit.

### *Detrimental Reliance*

In their second assignment of error, the defendants argue that the trial court was manifestly erroneous in "finding detrimental reliance in the absence of a

statutorily required written agreement." The reasons for judgment adopted by the trial court conclude that the plaintiffs reasonably relied to their detriment upon the defendants' representations and promises and experienced damages as a result. These damages included the $17,000.00 expense incurred for the architect to prepare plans for the franchise location, the time and money spent to train Shawna to manage the franchise location, and the anticipated $35,000.00 franchise fee. The defendants argue that since the law requires franchise agreements and non-competition agreements to be in writing, it was not reasonable for the plaintiffs to rely on alleged verbal representations, thus defeating a detrimental reliance claim. This argument is hinged on the defendants' assertion that a signed franchise agreement did not exist. However, since we have concluded that the trial court did not err in finding that the parties executed the written agreement filed in evidence, this argument fails. This assignment of error lacks merit.

### Attorney Fees

Finally, the defendants argue that the trial court erred in awarding attorney fees because the trial court "did not state in its Judgment why attorney's fees were being awarded . . . [and] did not reference what statute or basis by which it was authorized to award [Miss Bee's] attorney's fees."

It is well-settled that attorney fees are not allowed except where they are authorized by a particular statute or provided for by contract. *Smith v. State, Dep't of Transp. & Dev.*, 2004-1317, p. 17 (La. 3/11/05), 899 So.2d 516, 527. However, the defendants have cited no authority, and we are aware of none, for their assertion that the trial court is required to specify the source of its authority to award attorney fees. Nevertheless, the court's written reasons for judgment sets forth several bases for its award of attorney fees.

First, the Franchise Agreement between the parties provides for the reimbursement of "reasonable accounting and attorneys' fees" incurred by the

13

prevailing party in connection with a judicial proceeding to enforce the agreement. Since we have concluded that the trial court did not err in finding that this agreement existed, the award of reasonable attorney fees as provided for in the agreement is not error.

Further, where damages are awarded under LUTPA for unfair trade practices, *i.e.*, unfair methods of competition or unfair or deceptive acts or practices in the conduct of any trade or commerce, the trial court *shall* award reasonable attorney fees and costs. La. R.S. 51:1409(A); La. R.S. 51:1405(A). The trial court's reasons for judgment conclude that the defendants' actions in taking and using records, recipes, manuals, customer lists, and other information in order to operate a virtually identical business in direct competition with Brooke's Sno World violated LUTPA, and the defendants have not argued that this finding was in error. As such, an award of reasonable attorney fees and costs is also appropriate under La. R.S. 51:1409(A).

The Louisiana Supreme Court has set forth ten factors to be considered in determining the reasonableness of attorney fees: (1) the ultimate result obtained; (2) the responsibility incurred; (3) the importance of the litigation; (4) the amount of money involved; (5) the extent and character of the work performed; (6) the legal knowledge, attainment, and skill of the attorneys; (7) the number of appearances made; (8) the intricacies of the facts involved; (9) the diligence and skill of counsel; and (10) the court's own knowledge. *Whitney Bank v. NOGG, L.L.C.*, 2015-1399, pp. 5-6 (La.App. 1 Cir. 6/3/16), 194 So.3d 819, 824. The trial court has much discretion in fixing an award of attorney fees, and its award will not be modified on appeal absent a showing of an abuse of discretion. *Belanger*, 2020-0763 at p. 14, — So.3d at —. Although the appellants have not argued that the amount of the attorney fee awarded by the trial court was unreasonable, we note that in addition to pre-trial discovery, motions, and exception hearings, the

14

trial of this matter took place over the course of five days, including testimony of approximately twenty-two witnesses and introduction of a large number of exhibits. Under these circumstances, we cannot say that the trial court's award of a $20,000.00 attorney fee constitutes an abuse of discretion.

Finally, we note that plaintiffs argued in their appellee brief that they should be awarded an additional $10,000.00 in attorney fees for work performed post-trial in connection with the appeal. Additional attorney fees are usually awarded on appeal when a party appeals, obtains no relief, and the appeal has necessitated additional work on the opposing party's counsel, provided that the opposing party appropriately requests an increase. *Molinere v. Lapeyrouse*, 2016-0991, p. 16 (La.App. 1 Cir. 2/17/17), 214 So.3d 887, 898. Here, the plaintiffs did not follow the proper procedure to request an award of additional attorney fees, since they did not appeal or file an answer to the defendants' appeal, as required by La. C.C.P. art. 2133(A).[12] Thus, the plaintiffs are not entitled to an increase in attorney fees for defending this appeal. See *Molinere*, 2016-0991 at p. 17, 214 So.3d at 898.

## CONCLUSION

The judgment of the trial court is affirmed. Costs of this appeal are assessed to defendants-appellants, Kaci Hale Guidry, Lee Guidry, The Dugout of Thibodaux, LLC, and K-Lee Snoworld, LLC.

**AFFIRMED.**

---

[12] Article 2133(A) provides in part that an appellee who desires to have the judgment modified, revised, or reversed in part, or who demands damages against the appellant, must file an answer to the appeal.